STATE of Alaska, Appellant,

v.

Charles BUNDRANT, Appellee.

STATE of Alaska, Appellant,

v.

Konrad S. URI et al., Appellees.

STATE of Alaska, Appellant,

v.

Cory A. KALDESTAD, Appellee.

Nos. 2295, 2435, 2444.

Supreme Court of Alaska.

Jan. 19, 1976.

Rehearing Denied March 26, 1976.

532

Office of Attorney General of Alaska, Juneau, Gerald W. Markham, Asst. Atty. Gen., Anchorage, for appellant.

David B. Ruskin, Anchorage, for appellee Bundrant. William B. Rozell of Faulkner, Banfield, Doogan & Holmes, Juneau, Douglas M. Fryer of Moriarty, Long, Mikkelborg & Broz, Seattle, Wash., for appellees Uri, Kaldestad and others.

Edward H. Levi, Atty. Gen. of the U. S., Wallace H. Johnson, Asst. Atty. Gen., and Bruce C. Rashkow and Michael W. Reed, Dept. of Justice, Washington, D. C., as amicus curiae for U. S.

Evelle J. Younger, Atty. Gen. of Cal., Carl Boronkay, Asst. Atty. Gen., and Roderick Walston, Deputy Atty. Gen., as amicus curiae for Cal.

Before RABINOWITZ, C. J., and CONNOR and ERWIN, JJ.

### OPINION

ERWIN, Justice.

King crab occur in harvestable numbers in several areas of the Bering Sea off the coast of Alaska. Beginning in the late 1960's, the number of fishermen taking crabs from the Bering Sea increased significantly. As a result, in 1969 the Alaska Board of Fish and Game began efforts to regulate crabbing in that area, with the promulgation of 5 AAC 07.100, which created the "Bering Sea Shellfish Area" (BSSA), described as:

. . . all waters of the Bering Sea including all tributary bays except Bechevin Bay and Isanotski Strait . . . north of 54° 36′ N. lat., (the latitude of Cape Sarichef), south of 60° N. lat., and east of the U. S.—Russia convention line of 1867.

In 1973, in an effort to avoid the eventual depletion of this resource and to preserve the fishery at sustained yield levels, the Board established a maximum quota of 23 million pounds of crab for this area for the 1973–74 season (5 AAC 07.760).[1] It also prohibited possession or sale of crab taken "in violation of the rules and regulations promulgated by the board" if such crabs were taken in waters seaward of the state's territorial waters (5 AAC 36.040).

The Bering Sea Shellfish Area quota of 23 million pounds was reached on September 9, 1973, whereupon by field order the area was closed to crabbing until June 15, 1974.

In December, 1973, several crab fishermen brought suit in Federal Court, asking for a preliminary injunction against enforcement of 5 AAC 07.760 and 5 AAC 36.040. A three-judge District Court heard the case, *Hjelle v. Brooks*, and on April 30, 1974, enjoined the state from enforcing those regulations.[2]

Following this decision, the Board repealed the enjoined regulations and took alternative steps to govern crabbing in the Bering Sea in the season due to begin July 1, 1974. On May 9, 1974, the Board issued a stopgap regulation prohibiting possession of red king crab in the state until June 30, 1974 (5 AAC 39.690). On June 15, the Board repealed all previous king crab regulations (except the definition and gear limitation sections, 5 AAC 39.105, and 5 AAC 39.975) and issued a comprehensive set of emergency regulations (5 AAC 34.005–.940, 5 AAC 03.710, 5 AAC 06.710, 5 AAC 21.910). These regulations basically

1. According to a fish and game department biologist, this regulation was promulgated at the request of the National Marine Fisheries Service and "other interested parties."

2. 377 F.Supp. 430 (D.Alaska 1974).

prohibited the taking and possession of crabs in a closed area. A system of designation of closures was created by 5 AAC 34.005, whereby "statistical areas" were created, consisting of

(1) a registration area, comprised of all the waters within the statistical area which are waters subject to the jurisdiction of the state; and

(2) an adjacent seaward biological influence zone, comprised of all the waters within the statistical area which are not part of the registration area.

The acts giving rise to this appeal occurred in Statistical Area Q, defined in 5 AAC 34.900 as "the waters of the Bering Sea and Chuckchi Sea including all tributary bays except Bechein Bay and Isanotski Strait . ·. . north of 54° 36′ N. lat., (the latitude of Cape Sarichef)." 5 AAC 34.910, provided that the crabbing season for this area was to open on July 1, 1974.

Prior to July 1, an organization of Bering Sea crab fishermen (according to news accounts, based in Seattle), called the "Shellfish Conservation Institute," promulgated their own rules for the upcoming Bering Sea season. This group's rules called for the season to open on June 26.[3] Even before that date surveillance flights showed a large number of vessels engaged in crab fishing in the Bering Sea.[4] In response, on June 25 the board issued emergency regulations 5 AAC 07.710(b), 5 AAC 34.035(c)(5), 5 AAC 34.045, 5 AAC 34.095(c), and 5 AAC 34.910. These regulations basically put off the opening of the season and gave the Commissioner of Fish and Game discretion to open the season when "general order can be restored a. 1 the state can be assured that fishing will be conducted in a manner which will not jeopardize the rights of law abiding fishermen." [5] The Commissioner also issued notices that the season would not

open until all illegal crab pots were removed from the area. The fishermen who had been successful in the earlier *Hjelle* case asked the federal district court for a temporary restraining order against the new regulations, but it was denied.

All of the individual cases consolidated in this appeal arise from alleged violations of these closures or related regulations.

## THE INDIVIDUAL CASES

A. In No. 2295, defendant Bundrant was charged in superior court with seven counts of possession of migratory shellfish near St. Paul Island (within the three-mile limit) on various dates in October, 1973, which shellfish were taken "upon the high seas and the Bering Sea shellfish area" during a closed period under fish and game board regulations. The statutory reference in the complaint is to AS 16.10.200, which reads:

It is unlawful for a person taking migratory fish and migratory shellfish in high sea areas designated by the board or in violation of the rules and regulations promulgated by the board governing the taking of migratory fish and migratory shellfish in the designated areas to possess, sell, offer to sell, barter, offer to barter, give or transport in the state, including the waters of the state, migratory fish or migratory shellfish.

Bundrant moved to dismiss for lack of jurisdiction, asserting the invalidity of the Board's regulations. The motion was denied on March 27, 1974, but on September 10, after the federal court in *Hjelle* had enjoined enforcement of 5 AAC 36.040, the trial judge reconsidered and granted the motion to dismiss.

Bundrant is a legal resident of Washington state and is not a resident of Alaska.[6] He held commercial fishing licenses in Alaska in 1965–70 and in 1973. His vessel,

---

3. *See* "Board of Fish and Game Finding of Emergency" (issued June 25, 1974), Appellant's Brief No. 2435, at 36–37.

4. *Id.*

5. *Id.*

6. This information is from stipulations entered in the record.

the F. V. Billikin, was registered in Alaska along with its gear. During the 1973 season he had fished within the three-mile limit (although during the period of the violations, October 6–20, 1973, he fished only outside the three-mile zone). He had anchored and processed crabs within the zone every night during this period. He maintained in Dutch Harbor, Alaska, a warehouse for use in processing his catch. He received fuel, food, water, repairs, and emergency aid from Alaskans, and used fisheries data from the Alaska Department of Fish and Game.

B. In No. 2435, the defendants Uri, *et al.*, were charged with numerous counts of possession of king crab on several dates between June 30, 1974, and July 24, 1974, within a closed area; with possession of crab pots in a closed area; and with having taken crab in a closed area. These activities all took place from 16 to 60 miles from the Alaska coast. (Actually only one defendant, Perovich, is charged with fishing before July 1, the original opening date for the area.)

The statutory references in the complaints are to AS 16.05.920 (unlawful possession), AS 16.10.200 (unlawful taking), 5 AAC 34.900, 5 AAC 34.910, 5 AAC 34.098, and 5 AAC 34.090(c).

With the exception of Emil Vinberg, all of the defendants in this group are residents of states other than Alaska.

The conduct cited here as criminal all took place outside the three-mile limit (in distinction to Bundrant, who is charged with possession within territorial waters of shellfish illegally taken outside of it). The state offered proof that after setting their pots outside the three-mile limit, the defendants returned to territorial waters. Although the *Uri* record has no stipulations like those in *Bundrant* regarding ongoing contacts with Alaska while operating in the Bering Sea, there was testimony in *Uri* to the effect that American crab-

bers in the Bering Sea always use processing facilities in Alaskan ports because the fragility of king crab rules out travel to more distant ports.

The *Uri* defendants moved to dismiss on a number of grounds, including lack of jurisdiction, the unconstitutional vagueness of the regulations, and the illegality of the search of defendants' crab pots. The motion was granted by the trial judge, who adopted the defendants' argument that these regulations had intruded upon and were in conflict with an area of exclusive federal jurisdiction established by the Outer Continental Shelf Lands Act and were consequently prohibited by Article VI of the Constitution of the United States.

C. In No. 2444, defendant Kaldestad was charged with four counts, the first three of which are identical to the charges against the *Uri* defendants. The fourth count, however, charged possession within the three-mile limit of shellfish taken illegally outside of it (this being basically the same charge as that made against Bundrant, the distinction being that Bundrant was charged under the old regulations while Kaldestad was charged under the emergency regulations).

The statutory references in the fourth count of the complaint are to AS 16.10.-200,[7] 5 AAC 34.910, 5 AAC 34.098, and 5 AAC 34.090(c).

Kaldestad's case was handled below together with the *Uri* cases, and trial court's dismissal applied to it as well. In his memorandum, the judge noted that "these cases do not involve the state's jurisdiction to enact and enforce so-called 'landing laws.' The charges in these cases specifically relate to conduct wholly occurring outside of Alaska's territorial waters." Somehow, the fourth count against Kaldestad escaped the judge's attention.

In summary, the *Uri* defendants are charged with wholly extra-territorial activity prohibited by the emergency regula-

---

7. AS 16.10.200 is the state's "landing law," barring illegal taking on the high seas and subsequent possession in the state.

**536**

tions. Bundrant is charged with possession in the state's waters of shellfish taken outside it in contravention of the old regulations. Kaldestad is charged with both prohibited extra-territorial activity and with possession in the state's waters of shellfish taken outside of it in contravention of the emergency regulations.

Of all the defendants, only Emil Vinberg, of the *Uri* group, appears on the record to be an Alaskan citizen.

## GENERAL LEGAL SETTING

■ It has long been held that for most purposes, the nation's territorial limits are set at a point three miles distant from the low water line on the coast.[8] Although the United States and international law have historically recognized some limited exercise of sovereign authority beyond this point (e. g., for control of smuggling), the three-mile territorial boundary has enjoyed continued and general favor for a great many years.

■ For the United States, the first significant departure from this policy came in 1945, when President Truman issued a proclamation stating that

the United States regards the natural resources of the subsoil and seabed of the continental shelf beneath the high seas but contiguous to the coasts of the United States as appertaining to the United States, subject to its jurisdiction and control.[9]

This proclamation explicitly referred only to the mineral resources of the continental shelf. At the same time, the President issued a separate proclamation [10] expressing this nation's concern with inadequate management of the fisheries resources near our coasts, and announcing that

the Government of the United States regards it as proper to establish conservation zones in those areas of the high seas contiguous to the coasts of the United States wherein fishing activities have been or in the future may be developed and maintained on a substantial scale.

This proclamation merely announced this principle, however, and did not establish any such fisheries conservation zones. It was not until 1966 that any step of this sort was taken. In that year Congress passed the Contiguous Fisheries Zone Act, 16 U.S.C. §§ 1091–94, which established a 12-mile zone within which the United States exercises "the same exclusive rights in respect to fisheries in the zone as it has in its territorial sea . . . ." [11] Except as modified by treaty, the United States' jurisdiction over fisheries remains at this point today,[12] despite increasing calls for establishment of a 200-mile fisheries zone.

Meanwhile, before 1947, there had been a general assumption that the seaward boundaries of the coastal states extended to the outer edges of the three-mile limit. In 1947, the United States Supreme Court, in *United States v. California (First California)*,[13] reversed this assumption by ruling that the states' authority ends at the low-water mark, and that from that point to the three-mile limit the "territorial sea" was an area of exclusive federal jurisdiction. (The dispute in that case centered upon the issue of the proprietary exploitation of undersea oil reserves, but the court's opinion was essentially premised

---

8. There are ongoing disputes as to the method of calculating this line, but they are not generally relevant here. In general, *see* A. Gross, *The Maritime Boundaries of the States*, 64 Mich.L.Rev. 639 (1966).

9. Proclamation No. 2667, U.S.Code Cong. Serv. at 1199–1200 (1945).

10. Proclamation No. 2668, U.S.Code Cong. Serv. at 1200–01 (1945).

11. Thus by the Bartlett Act, 16 U.S.C. §§ 1081–86, the exclusion of foreign vessels from our territorial sea was extended to the 12-mile zone as well.

12. *See* discussion at p. 537, *infra*, on the extent to which the Outer Continental Shelf Lands Act applies to organic resources.

13. 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1946).

upon a recognition of the need for a unified national authority in an area so inextricably subject to defense and international relations considerations) it was concluded that the United States' paramount responsibilities thereto gave rise to its paramount authority in the area.)

The result of the *First California* case was reversed by Congress in 1953 when it passed the Submerged Lands Act (SLA), 43 U.S.C. §§ 1301–15.[14] This act confirmed proprietary title in each state to the lands and resources, including fish, beneath and within the navigable waters of the state, and placed the outer boundaries of the coastal states at the seaward edge of the three-mile limit.

In the same session, Congress also passed the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331–43, which began as an amendment to the Submerged Lands Act but was ultimately separated from it before its passage as a separate act. For purposes of this appeal, the heart of the OCSLA is § 1332, which reads:

(a) It is declared to be the policy of the United States that the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided in this subchapter.

(b) This subchapter shall be construed in such manner that the character as high seas of the waters above the outer Continental Shelf and the right to navigation and fishing therein shall not be affected.

Just exactly what the phrase "subsoil and seabed" includes is a major question in this case. The Submerged Lands Act uses the phrase "lands beneath navigable waters . . . and the natural resources within such lands and waters" (43 U.S.C. § 1311(a) ), and the term "natural resources" is defined to include fish and crabs (43 U.

S.C. § 1301(e) ). The Outer Continental Shelf Lands Act, however, does not refer to organic resources, nor does it define clearly its scope with respect to such resources.

Also of relevance in this case are the numerous treaties regarding North Pacific fisheries. We take note of the fact that there are now eleven such treaties, affecting species which account for 96 per cent of the value of the manufactured products of Alaska's commercial fisheries.[15] The two treaties which are most relevant here are the United States—U.S.S.R. King Crab Agreement and the United States Japan Coniguous Fishery Zone Agreement. Both of these regulate crabbing by Japan and the Soviet Union in that portion of the Bering Sea east of the United States—Russia Convention Line of 1867. Although the Russians are not now exercising their rights to a limited crab season under the agreement, the Japanese apparently do.

Although a number of bills have been introduced in Congress to create a comprehensive fisheries management scheme for the Outer Continental Shelf, none has passed to date.

## FEDERAL EXCLUSIVITY AND FEDERAL PRE-EMPTION

The appellees' first legal contention, broadly stated, is that fishery regulation in the sea beyond the three-mile limit is constitutionally an area of exclusive federal authority, thus Alaska is barred from legislating therein. This contention subsumes two quite distinct constitutional theories: federal exclusivity and federal pre-emption. According to former doctrine, certain provisions of the federal constitution which delegate powers to the central government implicitly restrict the police powers of the states and thereby carve out areas which can be regulated, if at all, only

14. This act was made applicable to Alaska by the Statehood Act, 72 Stat. 339.

15. E. Wunnicke, "The Legal Framework Governing Alaska Fisheries", *Alaska Fisheries Policy* (1972) p. 237.

by the federal government. The concept is one of exclusive federal domains.

■ The doctrine of federal pre-emption also deals with the allocation of state and federal responsibilities, but it speaks to those situations where there is recognized *concurrent* state and federal authority. It holds that when Congress has exercised its regulatory authority over a particular subject in manner to indicate an intention to deal fully and exclusively therewith, all state regulation in that particular field must yield. The basic premise is the supremacy of federal law.

### A. Federal Exclusivity

■■ Appellees' contention that fishery regulation beyond traditional territorial waters is an exclusive federal domain derives principally from the federal government's authority to regulate interstate and foreign commerce [16] and to manage foreign relations.[17] It is quite well established that the commerce clause of the federal constitution serves two distinct functions: to confer on the national government authority concurrent with the states over matters of interstate and foreign commerce, and, even in the absence of federal legislation, to prohibit state regulation in certain areas of commerce that are "national" in nature. The prohibitory force of the commerce clause was established in the great *"Cooley* compromise" [18] and has been reaffirmed countless times since that

historic decision.[19] Of course, it is today evident that not all that Congress can reach under the sweeping authority of the commerce clause is forbidden to the states. In delineating the smaller arena of exclusive federal concern, the Supreme Court has built upon the touchstone suggested in *Cooley:*

> Whatever subjects of this power are in their nature national, or admit only of one uniform system, or plan of regulations, may justly be said to be of such a nature as to require exclusive legislation by Congress.[20]

The difficulty with the criterion has been in its application, for few aspects of commerce are inherently either wholly "national" or wholly "local" in character. Although it has used a variety of catchphrases and labels,[21] the Supreme Court in modern times has recognized that the issue is essentially a reconciliation of conflicting claims of state and national power, which can be attained only by an appraisal of the competing state and national interests at stake.[22]

Absent congressional action, the familiar test is that of uniformity versus locality: if a case falls within an area in commerce thought to demand a uniform national rule, State action is struck down. If the activity is one of predominantly local interest, State action is sustained. More accurately, the question is whether the State interest is outweighed

---

16. U.S.Const., art. I, § 8.

17. U.S.Const., art. I § 8, art. II § 1, art. 6.

18. *Cooley v. Board of Wardens,* 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1852).

19. *Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959) ; *H. P. Hood & Sons v. DuMond,* 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949) ; *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945) ; *Edwards v. California,* 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941).

20. 53 U.S. (12 How.) 299, 319, 13 L.Ed. 996, 1005 (1852).

21. *E. g.,* "direct" burdens on interstate commerce are forbidden, while "indirect" burdens are permissible. *Hall v. DeCuir,* 95 U.S. 485, 24 L.Ed. 547 (1878) ; "undue" burdens are prohibited, *Dean Milk Co. v. Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951) ; "material" burdens are violative of the commerce clause, *Real Silk Hosiery Mills v. Portland,* 268 U.S. 325, 45 S.Ct. 525, 69 L.Ed. 982 (1925) ; "unreasonable" burdens are forbidden, *International Milling Co. v. Columbia Transp. Co.,* 292 U.S. 511, 54 S.Ct. 797, 78 L.Ed. 1396 (1934).

22. *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945).

by a national interest in the unhampered operation of interstate commerce.[23]

■ The national interest has consistently been held to predominate in two instances: when a state regulates in an area where nationally uniform regulations are truly necessary,[24] and when state regulations discriminate against out-of-state goods or manufacturers, threatening to provoke retaliatory restrictions inimical to national commerce.[25] Under these circumstances, the commerce clause invalidates the purported state legislation.

■ The Supreme Court has expressly declined to distinguish between state regulations of interstate commerce and regulation dealing with foreign commerce.[26] In either case the prohibitory reach of the commerce clause is determined by the same analysis of competing state and federal claims.[27]

Applying these principles, this court must decide whether the commerce clause renders the states powerless to regulate fisheries in waters beyond the three-mile limit. The potential national interest at stake appears multi-faceted. As to the need for national uniformity of regulation, it would appear doubtful that crabbing in the Bering Sea is of such a nature as to require such uniformity. In its brief as *Amicus Curiae* in this case, the United States government makes no claim for the exigency of federal regulation. Indeed, other federal documents indicate that local regulation might in fact be more efficacious. Specifically, a 1974 report commissioned and distributed by the Department of Commerce evaluates the prospect of federal regulation of fishing beyond state territorial waters. It concludes:

A basic assumption about fisheries regulation is that the substantial differences in both the kinds of fish caught and the fishing effort itself among the several states render a uniform approach to fisheries regulation throughout the United States inadvisable and self-defeating. . . .

. . . . . . .

[A] single regulatory body with jurisdiction over the [territorial and extra-territorial seas] would provide the most efficient and effective regulation and management of the fisheries resources of the area. It is submitted that either the states or regional commissions, with their substantial experience in regulating coastal fishing in virtually all its aspects and with their superior knowledge of the problems peculiar to fisheries resources off their own coasts should be that single regulatory body.[28]

The continued abstention from federal regulation of fishing in territorial waters, despite constitutional power to do so,[29] confirms the wisdom of the traditional approach of local, non-uniform management of fisheries resources.

■ The Supreme Court has held that a problem may be national in scope if an attempted local solution will invite retalia-

---

23. *California v. Zook*, 336 U.S. 725, 728, 69 S.Ct. 841, 843, 93 L.Ed. 1005, 1008 (1949).

24. *E. g., Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed. 1003 (1959); *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945).

25. *E. g., Baldwin v. G. A. F. Seelig, Inc.,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1934).

26. *Bob-Lo Excursion Co. v. Michigan,* 333 U.S. 28, 38–40, 68 S.Ct. 358, 363–64, 92 L.Ed. 455, 464 (1948).

27. *Hale v. Bimco Trading, Inc.,* 306 U.S. 375, 59 S.Ct. 526, 83 L.Ed. 771 (1939);

*Kelly v. Washington,* 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3 (1937); *Bayside Fish Flour Co. v. Gentry,* 297 U.S. 422, 56 S.Ct. 513, 80 L.Ed. 772 (1936); *New York ex rel. Silz v. Hesterberg,* 211 U.S. 31, 29 S.Ct. 10, 53 L.Ed. 75 (1908).

28. North Carolina University, *State and Federal Jurisdictional Conflicts in the Regulation of United States Coastal Waters,* at 12–13 (1974).

29. Browning, *Some Aspects of State and Federal Jurisdiction in the Marine Environment,* at 139–40 (1968).

tion by sister states.[30] Moreover, a problem may be national if it directly and significantly affects more than one state.[31] While it is clear that Alaska is the state most directly affected by the conduct of Bering Sea fishermen, there are large numbers of Washington crab fishermen and processors, for example—like most of the appellees here—who depend on the resources of this area. It may consequently be recognized that at least some other states have an interest in that fishery. However, the mere fact that crabbing in the Bering Sea represents commerce among and between several states does not preclude Alaska from acting. It is clear that " . . . there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it. . . ."[32] Moreover, there is absolutely nothing to suggest that these regulations are either by their terms or in their enforcement discriminatory against non-Alaskans. Assuming for the moment that the state does have jurisdiction over the entire crabbing field, there is no reason to think that exercise of this jurisdiction in a patently neutral fashion will provoke retaliatory restrictions by Alaska's sister states.

Appellees also contend that the national interest in unfettered international commerce may be jeopardized by Alaska's regulations. On their face, these regulations apply to all fishermen, not just Americans. Thus, there is a potential for conflict with United States agreements with foreign nations concerning fishing practices on the high seas, for example the Soviet Bilateral agreements with the United States. The federal government is also currently concerned with the unilateral extension to 200 miles of maritime boundaries by nations such as Peru, thus restricting access by United States fishermen to traditional anchovy and tuna grounds. Enforcement of the Alaskan regulations against foreign nationals could be taken as just such a unilateral step by the United States, inviting reciprocal moves by other nations.

The state's response is that these regulations, being aimed at United States fishermen, will not be enforced against foreign nationals. *See Hjelle v. Brooks.*[33] Indeed, to the extent these regulations are inconsistent with fishing rights granted to foreign nations pursuant to the treaty power, the Supremacy Clause dictates that they must yield. The state does not dispute this, but urges that no conflict is apparent or even probable in view of the fact that these regulations were promulgated at the urging of *federal* agencies to implement their treaties.[34]

The possible ramifications of these regulations on international commerce appear extremely speculative at this point. We feel that, absent some further showing of impact, this aspect of the national interest should be given minimal weight. The threat of conflict with international agreements or foreign rights is " . . . so remote that it is hardly more than conceivable." *Bob-Lo Excursion Co. v. Michigan.*[35]

The court turns next to a consideration of the state interest in regulating the harvesting of crab in the Bering Sea. Fishing now constitutes the largest single industry in Alaska and crabbing is a substantial

30. *Morgan v. Virginia,* 328 U.S. 373, 66 S.Ct. 1050, 90 L.Ed. 1317 (1946) ; *Edwards v. California,* 314 U.S. 160, 32 S.Ct. 164, 86 L.Ed. 119 (1941) ; *Hall v. DeCuir,* 95 U.S. 485, 24 L.Ed. 547 (1878).

31. *Buck v. Kuykendall,* 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623 (1925) ; *Hall v. DeCuir,* 95 U.S. 485, 24 L.Ed. 547 (1878).

32. *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 767, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915, 1923 (1945).

33. 377 F.Supp. 430, 438 (D.Alaska 1974).

34. Reply Brief of Appellant, No. 2435, at 15.

35. 333 U.S. 28, 37, 68 S.Ct. 358, 363, 92 L.Ed. 455, 463 (1948). *See also Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 447, 80 S.Ct. 813, 818, 4 L.Ed.2d 852, 858 (1960) ; *Ghera v. Department of Fish and Game,* No. 47823 SAW at 8 n. 1 (N.D.Cal.1973) [unpublished opinion reprinted in Appendix to Appellant's Brief in No. 2435].

portion of that activity.[36] Most of the services which support the crabbing fleet are provided in Alaskan harbors, and much of the processing and canning of the harvested resource is done in factories throughout the state. Exhaustion of this marine resource would have a devastating impact on employment in this state which still has a relatively narrow industrial base. Particularly crippled would be those villages along our shores whose sole livelihood comes from the sea.

■ Moreover, Alaskan king crab is an important food source for the people of this state. The commerce clause has consistently been interpreted to permit state regulations which safeguard local food sources, for example, quarantine laws.[37] In sustaining a California regulation governing the harvesting of avocados, the Supreme Court said:

Specifically, the supervision of the readying of foodstuffs for market has always been deemed a matter of peculiarly local concern.[38]

This court concludes that these regulations deal with a problem particularly local in import and in a way fully compatible with the commerce clause. We derive support for this conclusion from the Supreme Court decision in *Alaska v. Arctic Maid*,[39] in which the court considered the constitutionality of an Alaskan occupation tax on freezer ships stationed beyond territorial waters but receiving catches taken within the three-mile limit. The issue there was whether the state was attempting to tax an integral link of interstate commerce, in violation of the implicit restrictions of the commerce clause. In holding that the ter-

ritorial tax did not contravene the constitution, Justice Douglas spoke with language of continuing force:

The process of gathering fish either through the catcher boats that are part of respondents' fleet or through independent operators is a "local activity" . . . in a vivid sense of the term. Here . . . the market for the product obtained locally is interstate, the taking being a step in a process leading to an interstate market. . . . [T]he local product is promptly loaded for interstate shipment. But . . . there is a preliminary local business being conducted . . . an occupation made up of a series of local activities which the State can constitutionally reach.[40]

■ We conclude that the commerce clause does not render regulation of fisheries in the Bering Sea the exclusive domain of the federal government.

■ We turn next to the contention that the challenged fishery regulations represent state intrusion into the field of foreign affairs, an exclusive federal domain. The Constitution does not in so many words entrust to the national government the power to conduct external relations. Instead, it parcels out certain aspects of the foreign affairs power among the political departments and imposed certain prohibitions on the states. From these constitutional references and from the fundamental premises of our system of federalism flows one of our most basic principles of government:

Governmental power over external affairs is not distributed, but is vested exclusively in the national government.[41]

36. *See Hjelle v. Brooks*, 377 F.Supp. 430, 443 (D.Alaska 1974) [concurring opinion].

37. *Rasmussen v. Idaho*, 181 U.S. 198, 21 S.Ct. 594, 45 L.Ed. 820 (1901) ; *Morgan's R. R. and Steamship Co. v. Louisiana*, 118 U.S. 455, 6 S.Ct. 1114, 30 L.Ed. 237 (1886).

38. *Florida Avocado Growers v. Paul*, 373 U.S. 132, 144, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248, 258 (1963).

39. 366 U.S. 199, 81 S.Ct. 929, 6 L.Ed.2d 227 (1961).

40. 366 U.S. 199, 203–04, 81 S.Ct. 929, 931–32, 6 L.Ed.2d 227, 230–31 (1961). *See also Toomer v. Witsell*, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948) ; *Oliver Iron Min. Co. v. Lord*, 262 U.S. 172, 43 S.Ct. 526, 67 L.Ed. 929 (1923).

41. *United States v. Belmont*, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937). *See also*

■ A concomitant principle is that a state cannot enact legislation which constitutes ". . . an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress," and the Supreme Court has invalidated an Oregon statute on that ground.[42] However, the states in the management of their affairs must necessarily impinge on foreign relations in a myriad of ways;[43] the precise delineation of this arena of exclusive federal domain remains largely unexplored.

■ In *Zschernig v. Miller*,[44] the Supreme Court gave great weight to the fact that the challenged statute had more than ". . . some incidental or indirect effect in foreign countries. . . .," it had ". . . great potential for disruption or embarrassment" of our foreign policies. This suggests to us that an analysis not unlike that under the commerce clause is appropriate. Certain state infringements on foreign affairs are forbidden because national uniformity is required or because they discriminate against or unduly burden our foreign relations. Generally, the inquiry will balance the state's interest in the regulation against its impact on United States foreign relations.[45]

■ Under this analysis the crabbing regulations at issue cannot be said to intrude upon the nation's foreign relations. Alaska does not seek to discriminate against foreign fishing fleets; indeed, if anything, it favors foreign nationals by refraining from enforcing the regulations against such parties. The potential conflict is at best only speculative and indirect at the present time. Our analysis of the state's jurisdiction, *infra*, suggests that the state may never possess authority over foreign fleets in the crabbing area, hence the threat of international imbroglio appears quite attenuated. For these reasons this court concludes that the crabbing regulations are not violative of the national government's exclusive prerogatives in the field of foreign affairs.

Finally, in considering the issue of federal exclusivity, this court must consider the "submerged land cases,"[46] relied on by appellees Uri, et al., and Kaldestad.[47] The Supreme Court in *United States v. Califor-*

*Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). One commentator has explained:

> As a sovereign power possessed by the nation, the power over foreign affairs is *inherent, exclusive,* and *plenary*. It is inherent, since . . . it does not depend for its existence upon the affirmative grants of the Constitution. It is exclusive in the Federal Government, both because of express prohibition on the states in this field and because only the Union is vested with the attributes of external sovereignty. For national purposes, embracing our relation with foreign nations, we are but one people, one nation, one power.

2 B. Schwartz, A Commentary on the Constitution of the United States, § 206, at 97–98 (1963).

42. *Zschernig v. Miller*, 389 U.S. 429, 432, 88 S.Ct. 664, 666, 19 L.Ed.2d 683, 687 (1968). *But see Gorun v. Fall*, 393 U.S. 398, 89 S.Ct. 678, 21 L.Ed.2d 628 (1968). *See generally*, Marer, *The Bases and Range of Federal Common Law on Private International Matters*, 5 Vand.J.Transnational L. 133 (1971).

43. *E. g., Clark v. Allen*, 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947). *See generally* L. Henken, Foreign Affairs and the Constitution, 238 (1972).

44. 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968). *See also Henderson v. New York*, 29 U.S. 259, 23 L.Ed. 543 (1876); The Federalist Papers, Nos. 3, 4, 5, 42, and 80; *Bethlehem Steel Corp. v. Board of Commissioners*, 276 Cal.App.2d 221, 80 Cal.Rptr. 800 (Cal.App.1969).

45. *See* L. Henken, *supra* note 26, at 241.

46. *United States v. Maine*, 420 U.S. 515, 95 S.Ct. 1155, 43 L.Ed.2d 363 (1975); *United States v. California (Second California)*, 381 U.S. 139, 85 S.Ct. 1401, 14 L.Ed.2d 296 (1965); *United States v. Florida*, 363 U.S. 121, 80 S.Ct. 461, 4 L.Ed.2d 1096 (1960); *United States v. Louisiana*, 363 U.S. 1, 80 S.Ct. 961, 4 L.Ed.2d 1025 (1960); *United States v. Texas*, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 221 (1950); *United States v. Louisiana*, 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216 (1950); *United States v. California (First California)*, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947).

47. Brief of appellees Uri *et al.* and Kaldestad, Nos. 2435, 2444, at 8–10.

*nia (First California)* [48] held that the submerged lands *within* the three-mile belt were an area of paramount federal authority. The decision was in large part based upon the rationale that concerns of national defense, foreign affairs, and international commerce required that result. The court observed that

> . . . insofar as the nation asserts its rights under international law, whatever of value may be discovered in the seas next to its shores and within its protective belt, will most naturally be appropriated for its use. But whatever any nation does in the open sea, which detracts from its common usefulness to nations, or which another nation may charge detracts from it, is a question for consideration among nations as such, and not their separate governmental units. [49]

In 1950, in response to a claim by Louisiana of territorial jurisdiction as far as 27 miles from shore, the Court in *United States v. Louisiana* held that *First California* controlled and noted that

> . . . If, as we held in California's case, the three-mile belt is in the domain of the nation rather than that of the separate States, it follows a fortiori that the ocean beyond that limit also is. The ocean seaward of the marginal belt is

perhaps even more directly related to the national defense, the conduct of foreign affairs, and world commerce than is the marginal sea. Certainly it is not less so. [50]

As mentioned, the result in *First California* was negatived by the Submerged Lands Act, but that act did not purport to effect rights beyond the three-mile limit of the territorial sea. Consequently, the rationale of the *First California* and *Louisiana* cases is still valid as applied to areas seaward of the territorial belt. And while those decisions never explicitly refer to the living resources of the oceans (the motivation behind both cases lay in control of exploitation of mineral resources, particularly oil), appellees argue that the logic applies with equal force to the use of the surface and waters for fishing purposes as to use of the seabed and subsoil for mineral exploitation: in both instances, regulation by individual states could conflict with federal activities in the areas of national defense, foreign affairs, and international commerce. [51]

The *First California* and *Louisiana* decisions therefore stand among other things for the principle that the federal government has *paramount* authority over the seas and submerged lands on both sides of the traditional three-mile limit; with

---

48. 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1897).

49. *Id.* 332 U.S. at 35, 67 S.Ct. at 1666–67, 91 L.Ed. at 1897.

50. 339 U.S. 699, 705, 70 S.Ct. 914, 917, 94 L.Ed. 1216, 1220 (1950).

51. That the logic of these cases is still alive is apparent from the United States Supreme Court's recent decision in *United States v. Maine*, 420 U.S. 515, 95 S.Ct. 1155, 43 L.Ed. 2d 363 (1975). Maine and the other Atlantic coast states claimed sovereignty rights over the seabed and subsoil to the outer edge of the continental shelf, based on certain colonial grants. The court rejected these claims and affirmed a Master's Report that as a matter of "purely legal principle . . . the Constitution . . . allotted to the federal Government jurisdiction over foreign commerce, foreign affairs and national defense," and that "it necessarily follows, as a matter

of constitutional law, that as attributes of these external sovereign powers of the federal government has paramount rights in the marginal sea." 420 U.S. at 522, 95 S.Ct. at 1159, 43 L.Ed.2d at 369. Although this decision specifically related to claims to the "seabed," and the underlying concern was again mineral resources, the court at one point reinterprets *First California* as establishing "that in our constitutional system paramount rights *over the ocean waters* and their seabed were vested in the Federal Government." 420 U.S. at 520, 95 S.Ct. at 1158, 43 L.Ed.2d at 368 (emphasis added). While it may be error to assume from this that the court consciously considered the problem of waterborne resources and so applied this logic to them, it may however be taken to indicate that the court did not consciously draw a distinction between seabed and seawaters and apply their logic only to the former.

this the state does not contest. However, these decisions do not establish that the federal government has *exclusive* authority in these seas. This much is made clear by *Toomer v. Witsell,*[52] wherein the court said that state regulation of fishing within territorial waters in the absence of conflicting federal legislation was valid so long as it comported with the applicable constitutional provisions. In *Skiriotes v. Florida,*[53] certain Florida regulations governing the taking of sponges beyond territorial waters were also upheld.

Thus, it is clear that in the absence of an exercise of the federal government's paramount powers over fishing, the states enjoy some regulatory prerogatives. It is the question whether the federal government has in fact exercised those powers to which we next turn.

B. Federal Pre-emption

Generally state laws must yield when they are in conflict with federal law or when Congress has indicated an intent to occupy a particular field exclusively. In the case of crabbing in the Bering Sea, we are persuaded that there is no direct conflict (other than the potential problems noted *supra*) with federal regulation, because there is simply no material federal regulation of this activity; there is no evidence of federal regulatory efforts indicative of federal intent to pre-empt.[54] We must consequently look to whether there is elsewhere any indication of congressional

intent that only the federal government should regulate this activity.

The fact that federal law occupies only a part of a field ordinarily leaves the states free to cover the other aspects of it.[55] A partial occupation of the field by the federal government should not give rise to an inference of congressional intent to pre-empt; such an inference from a partial occupation is permissible only if the federal law is in actual conflict with the law of the state.[56] Absent actual direct conflict, there must be clear evidence of congressional intent to pre-empt the field.[57]

In this case appellees primarily base their argument of federal pre-emption of crabbing regulation beyond the three-mile limit on the terms of the Outer Continental Shelf Lands Act,[58] as elucidated by its legislative history and by several other federal acts and international agreements. OCSLA extended federal jurisdiction over the "subsoil and seabed" of the continental shelf beyond the three-mile territorial zone.

In its relevant provision the Act provides:

It is declared to be the policy of the United States that *the subsoil and seabed* of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided in this subchapter. (Emphasis added)[59]

In 43 U.S.C. § 1333(e)(2), the Act also provides for the adoption of state law as

---

52. 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948).

53. 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941).

54. *Cf., Burbank v. Lockheed Air Terminal,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973).

55. *Skiriotes v. Florida,* 313 U.S. 69, 75, 61 S.Ct. 924, 928, 85 L.Ed. 1193, 1199 (1941); *Savage v. Jones,* 225 U.S. 501, 32 S.Ct. 715, 56 L.Ed. 1182; In Re Squires, 114 Vt. 285, 44 A.2d 133 (1945).

56. *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960).

57. *Head v. New Mexico Bd. of Examiners,* 374 U.S. 424, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963); *Schwartz v. Texas,* 344 U.S. 199, 73 S.Ct. 232, 97 L.Ed. 231 (1952); *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). *See Kelly v. Washington,* 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed.2d 3 (1937); *Lincoln Federal Labor Union v. Northwestern Iron & Metal Co.,* 149 Neb. 507, 31 N.W.2d 477 (1948); *California v. Zook,* 336 U.S. 725, 69 S.Ct. 841, 93 L.Ed. 1005 (1948); *Allen-Bradley Local v. Wisconsin Employment Relations Bd.,* 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154 (1942).

58. 43 U.S.C. §§ 1331–43 (1953).

59. 43 U.S.C. § 1332(a) (1953).

"surrogate federal law"[60] to govern the Outer Continental Shelf when not in conflict with other federal measures. However, an important qualification was appended to this provision:

The provisions of this section for adoption of State law as the law of the United States shall never be interpreted as a basis for claiming any interest in or jurisdiction on behalf of any State for any purpose over the seabed and subsoil of the outer Continental Shelf, *or the property and natural resources thereof* or the revenues therefrom. (Emphasis added) [61]

Appellee contends that in the OCSLA Congress intended to establish federal preemption of all the natural resources of the outer shelf, including crab. As noted earlier, while the Submerged Lands Act refers to and provides a definition of the "natural resources" which explicitly includes crabs, the OCSLA lacks any similar definitional identification of the natural resources of the subsoil and seabed. It is urged that we refer to the definition in the Submerged Lands Act as evidence that Congress intended to include crabs within the terms of the OCSLA.

 It is unquestioned that, although they were closely related in time and origin, the SLA and the OCSLA constitute separate acts of Congress. Thus, one cannot argue that the SLA definition of "natural resources" is directly applicable to the terms of the OCSLA. However, the general rule is that a statute in pari materia with a subsequent, but approximately contemporaneous, measure is a proper source of evidence of legislative intent in that second measure.[62] In the words of one authority,

. . . [I]f it is natural and reasonable to think that members of the legislature . . . would think about another statute and have their impressions derived from it influence their understanding of the act whose effect is in question, then a court called upon to construe the act in question should also allow its understanding of it to be influenced by impressions derived from the statute.[63]

 We are not convinced that the SLA would never be of assistance in construing the provisions of the OCSLA. In this case, however, the SLA definition of natural resource is of no help. We may assume, as the appellees claim, that crab and other fish are part of the natural resources which lie beyond the state's territorial waters. The OCSLA does not by its terms preclude the state from asserting jurisdiction over *all* the natural resources which are beyond its boundaries. Rather, the act merely provides that no state shall have jurisdiction over the *"subsoil"* and *"seabed"* of the outer continental shelf, and the "natural resources *thereof*." 43 U.S.C. § 1333(a)(3). (Emphasis added) The "thereof" reference limits the act's scope to the natural resources which are part and parcel of the outer shelf.[64] Thus, the issue properly before us is whether crabs are a resource of the subsoil and seabed, as opposed to a resource of the superadjacent waters.

Appellees contend that federal legislation and international agreements subsequent to passage of the OCSLA evidence Congress' intent that sedentary species of marine life,

---

**60.** *Rodrigue v. Aetna Cas. Co.,* 395 U.S. 353, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969); *Chevron Oil Co. v. Huson,* 404 U.S. 97, 30 L.Ed. 2d 296, 92 S.Ct. 349 (1971).

**61.** 43 U.S.C. § 1333(a)(3) (1953).

**62.** D. Sands, Sutherland Statutory Construction, § 51.01 (4th Ed. 1972).

**63.** *Id.* at § 51.03.

**64.** *See also* 43 U.S.C. § 1333(a)(1) (1953), which provides in part:

The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands and fixed structures which may be erected thereon for the purpose of exploring for, developing, removing, and transporting *resources therefrom* . . . . [Emphasis added]

such as crabs, were among the resources of the seabed over which it was assuming exclusive jurisdiction. The 1958 Convention on the Continental Shelf, of which the United States is a signatory, considers "sedentary species" to be resources of the continental shelf, thus giving to the coastal nation "sovereign rights" for the exploitation of that natural resource. That crabs were intended to be in this category is confirmed by the 1973 Agreement between the United States and the USSR on king and tanner crabs, which explicitly lists crabs as "natural resources of the continental shelf" for purposes of the 1958 Convention's placement of sovereign rights in the coastal nation. As evidence of Congressional intent, however, these documents are of little persuasive force. The Convention was drafted by parties other than Congress and only establishes a claim of United States jurisdiction over sedentary species; it says nothing with respect to whether in our internal structure of government that jurisdiction is exercised at the federal or the state level. The 1973 Agreement was an executive agreement not reviewed by Congress.

Appellees also point to the Bartlett Act,[65] passed eleven years after the OCSLA. This legislation was the means by which the United States brought into force against foreign nationals the rights it obtained pursuant to the 1958 Convention, particularly the right to control or prohibit the taking of fishery resources of the continental shelf. In 16 U.S.C. § 1081 (1970), Congress has forbidden foreign nationals from taking crabs and other sedentary shelf resources except pursuant to international agreement. This foreign policy measure is hardly indicative that a decade earlier Congress had intended to realign domestic responsibilities so to pre-empt

further state regulation of sedentary marine life.

■ Our review of appellees' arguments does not persuade us that the OCSLA was intended as an exercise of federal pre-emption over both seabed mineral resources and sedentary marine species. Rather, this court is of the view that the actual distinction intended was between the inorganic resources of the subsoil and seabed (principally oil), which were thenceforth to be the exclusive domain of the federal government, and organic marine life resources, which were not affected by the act. We draw support for this conclusion from a variety of sources. First, though not totally unambiguous, the legislative history of OCSLA evidences Congress' true concern:

> The purposes of S. 1901, as amended, is to assert the exclusive jurisdiction and control of the Federal Government of the United States *over the seabed and subsoil* of the outer Continental Shelf, and to provide for the development of its vast *mineral* resources. [Emphasis added][66]

Second, the Act expressly disclaims any effect on fishing and navigation rights.

> This subchapter shall be construed in such manner that the character as high seas of the waters *above* the outer Continental Shelf and the right to navigation and *fishing therein* shall not be affected. [Emphasis added][67]

The origins of this disclaimer reveal exactly what it was intended to encompass. Senator Cordon, the floor manager of the OCSLA, remarked with reference to this provision ". . . that we are excepting from the operation of this act *all marine life above the land itself beneath the seas.*"[68] [Emphasis added] "Fishing" in

---

65. 16 U.S.C. §§ 1081–86 (1970).

66. Sen.Rep.No.411, 83rd Cong., 1st Sess. (1953). *See also* remarks of Senator Douglas, 99 Cong.Rec. at 2868 (1953):
 We are not particularly interested in kelp, or shrimp or oysters, those are sideshows. The question is as to oil and gas.

67. 43 U.S.C. § 1332(b) (1953).

68. Sen.Rep.No.411, 83rd Cong., 1st Sess. (1953).

this context has traditionally been understood to include the taking of both free swimming and sedentary forms of marine life.[69]

Third, we must recall that this legislation was passed only a decade after the Supreme Court decision on *Skiriotes v. Florida*.[70] If appellees are correct in asserting that the act precludes a state from regulating extra-territorial fishing for sedentary marine life, the act would then preclude a state from regulating fishing by its own citizens on the high seas. In that event, the act would have to be considered to have overruled the *Skiriotes* decision. However, nothing whatever in the act or its legislative history suggests such a Congressional design, and we are unwilling to infer that Congress would have acted to that end without making its intention known. A far more plausible interpretation is that Congress did not believe that the OCSLA in any manner affected the state's rights to regulate the taking of sponges, crabs, and other forms of sedentary and nonsedentary marine life.

Fourth, the few authorities which have considered the reach of OCSLA in extra-territorial waters seem to confirm that the distinction between mineral and marine resources is central to the statutory scheme. In *Guess v. Read*,[71] for example, the court dealt with the question of whether a Louisiana statute could be applied in an action resulting from a death after a helicopter crashed in the sea beyond that state's territorial limits. The court said the OCSLA did not apply because

> [t]he Continental Shelf Act was enacted for the purpose, primarily, of asserting

ownership of and jurisdiction over the minerals in and under the Continental Shelf. Jurisdiction was asserted over "the subsoil and seabed" of the outer Continental Shelf. 43 U.S.C.A. § 1332(a). It is only for "that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon" that the State law applies. 43 U.S.C.A. § 1333(a)(2). This does not include the sea above the subsoil and seabed and does not include the air above the sea.[72]

Somewhat more troublesome is *United States v. Ray*,[73] a case in which two private developers planned to build on coral reefs four and one-half miles off the coast of Florida and maintain their projects as separate nations. The United States sued for an injunction, claiming control over the reefs, and the Court of Appeals for the Fifth Circuit agreed. It affirmed the lower court's finding that the skeletal coral remains constituted part of the "seabed," as that term is used in the OCSLA. However, the court also relied on terms in the Geneva Convention on the Continental Shelf and the Submerged Lands Act to support its claims. As we have explained, those provisions are not germane to the question on whether Congress has exercised its constitutional power to exclude the states from management of sedentary marine life beyond the three-mile limit. While we are in agreement with the result in *Ray*, we do not subscribe to the method of legislative analysis employed therein.

There is a final indication that Congress did not by the OCSLA intend to pre-empt ocean fisheries regulations by the states.

---

69. *See e. g.*, the treatment of taking sponges as "fishing" in *Skiriotes*. That Congress also used the term in the broader sense is evident from the legislative history. *See* Hearings on H.R. 5991 and 5992 Before a Subcomm. of the House Comm. on the Judiciary, 81st Cong., 1st Sess. at 190 (1949) ; Hearings on S.J.Res. 20 Before the Senate Comm. on Int. and Ins. Affairs, 82d Cong., 1st Sess. at 50–54 (1951) ; Hearings on S. 155 Before the Senate Comm. on Int. and Ins. Affairs, 81st Cong., 1st Sess. at 245, 391, 414 (1949).

70. 211 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941).

71. 290 F.2d 622 (5th Cir. 1961), *cert. denied* 368 U.S. 957, 82 S.Ct. 394, 7 L.Ed.2d 388.

72. 290 F.2d at 625. *See also Employers Mut. Cas. Co. v. Samuels*, 407 S.W.2d 839 (Tex. Ct.Civ.App.1966) ; cf. *Hjelle v. Brooks*, 377 F.Supp. 430, 439–40 n. 4 (D.Alaska 1974).

73. 423 F.2d 16 (5th Cir. 1970).

Currently pending in Congress are bills [74] to enact the "High Seas Fisheries Conservation Act of 1973." These measures explicitly authorize agencies of the federal government to regulate activities of American citizens in ocean fisheries. Proponents are of the view that this is the first occasion on which it has attempted to exercise federal control over the taking of fishery resources.[75] This strongly suggests to us that OCSLA did not have the preemptive intent which is ascribed to it by appellees.

In any event, we are ultimately persuaded that under the circumstances the absence of any *clear* indication the federal exclusivity or pre-emption in this area is significant. The issue as raised in this appeal is unquestionably of crucial import, for other states as well as our own, and in view of the closeness of the question—of the considerable merit we find in the arguments presented on both sides—this is a case uniquely appropriate for honoring the presumption of constitutionality and validity which adheres to the acts of our legislature. This court acknowledges its duty not to declare statutes unconstitutional unless such repugnancy clearly appears.[76] We moreover acknowledge that our decision today may provide the most effective vehicle for assuring that this matter will at last receive the prompt and definitive attention by the final arbiters of such questions—the Congress or the Supreme Court of the United States.

## STATE FISHERIES JURISDICTION

Having concluded that the doctrines of federal exclusivity and pre-emption are not applicable, and that these regulations are not invalid under Supremacy clause of the Constitution of the United States, we turn now to the question of the extent to which Alaska may extend the reach of its laws and police power beyond the confines of its territorial borders.

The appellees and the United States (appearing as amicus curiae) argue that a state has no legal authority to extend its control over fisheries over any area outside the three-mile limit. They take the position that the cases of *Manchester v. Massachusetts* [77] and *Toomer v. Witsell* [78] relied upon by appellants must be read restrictively to provide that a state may exercise power to regulate fisheries only to the limits of its territorial sovereignty.

The appellant and the State of California, as amicus, urge strongly on the other hand that such cases must be construed liberally in order to permit effective fishery management. They propose a theory that the state's "imperium," or "political" jurisdiction, can extend to activities beyond the boundaries of its territory, or "dominium," when there is sufficient nexus between the activities and legitimate state interests—particularly in the area of the management of migratory fish and game. They argue that not only must the State be able to regulate fishing of all within the three-mile limit, it must be permitted to regulate the fishing of all outside the three-mile limit in those zones where there is a definite impact or an integral relationship between control of the fishery resource outside the three-mile limit and inside the three-mile limit. They argue that fishing management is meaningless if fishermen may wait until the particular fishery resource migrates outside the three-miles limit and then may fish without restraint.

74. H.R. 4760, H.R. 4756, 93rd Cong., 1st Sess. (1973).

75. *See, e. g.*, Statement of Dr. Robert M. White, Administrator, National Oceanic and Atmospheric Administration, in Hearings Before the U. S. House Committee on Merchant Marine and Fisheries, Subcommittee on Fisheries and Wildlife Conservation and the Environment, 93rd Cong., 1st Sess. (1973).

76. *E. g., United States v. R. & J. Enterprises*, 178 F.Supp. 1 (D.C.Alaska 1959) ; *Leege v. Martin*, 379 P.2d 447 (Alaska 1963) ; *In Re Paul*, 17 Alaska 360 (1957).

77. 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159 (1890).

78. 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948).

While the position of appellant is appealing from a standpoint of effective resource management, the question becomes whether this factor has been recognized by the United States Supreme Court as permitting the extension of state political control.

Each party cites the same cases and draws differing conclusions from the language thereof.[79] We find, however, the language of several to be particularly helpful.

*Skiriotes v. Florida* [80] is the touchstone for much of the dispute in this area. In *Skiriotes*, a sponge fisherman, a citizen of Florida, was charged with taking sponges with diving equipment, as prohibited by state law. There was controversy over whether the incident occurred within or without Florida's territorial waters, however; but the United States Supreme Court said that that question was of no concern, because the state had power to proscribe defendant's activity inside *or* outside the territorial waters. Specifically, it found that Florida had a legitimate interest in this exercise of the police power, at least as far as it was applied to the territorial waters in the absence of conflicting federal legislation. Then, reasoning by analogy to the principle that a nation may control the activities of its own citizens on the high seas,[81] the court said:

If the United States may control the conduct of its citizens upon the high seas, we see no reason why the State of Florida may not likewise govern the conduct of its citizens upon the high seas with respect to matters in which the State has a legitimate interest and where there is no conflict with acts of Congress. (313 U.S. at 77, 61 S.Ct. at 929).

A recent development in the *Skiriotes* line of cases came after Florida passed a statute permitting regulation of fishing activities both within and without the state boundaries.[82] In *Felton v. Hodges,*[83] Florida conservation officials arrested the appellant for operating crawfish traps outside the state's territorial limits during the closed season for crawfishing in that state. Felton brought a federal civil rights action, claiming the state had no authority to regulate crawfishing beyond its territorial waters and so was denying him due process. The appeals court affirmed a dismissal of his federal court action on the basis of *Skiriotes*. It said:

Following the approach dictated by *Skiriotes*. we must inquire whether Florida has a legitimate interest in controlling the activities which it sought to regulate here. It appears . . . that appellant's crawfish traps were located in a group of reefs adjacent to the Florida Keys, and that the crawfish in this area move freely in and out of Florida's territorial waters, so that any taking of them would clearly have an effect upon the State's conservation efforts. Under these circumstances, we think it apparent that the State has an interest sufficient to enable it to subject appellant, one of

79. *Manchester v. Massachusetts*, 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159 (1890); *Silz v. Hesterburg*, 211 U.S. 31, 39 S.Ct. 10, 53 L.Ed. 75. (1908); *Bayside Fish Co. v. Gentry*, 297 U.S. 422, 56 S.Ct. 513, 80 L.Ed. 772 (1936); *United States v. First California*, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947); *Skiriotes v. Florida*, 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1198 (1941); *Toomer v. Witsell*, 324 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948); *United States v. Louisiana*, 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216 (1950); *United States v. Second California*, 381 U.S. 139, 85 S.Ct. 1401, 14 L.Ed. 296 (1965).

80. 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed.2d 1193, (1941).

81. On Florida's attempts at regulation, and fishing jurisdiction problems in general, see D. Cowan, *Era of Militant Fishing Jurisdiction—A Study of the Florida Territorial Waters Act of 1963*, 23 Univ. of Miami L. Rev. 160 (1966).

82. 72 Mich.L.Rev. 1087 (1974); Restatement of Foreign Relations § 30 (1965).

83. 374 F.2d 337 (5th Cir. 1967).

its own citizens, to the conservation regulations which it sought to enforce here.[84]

The Court also found valid the arrest of Felton beyond the three-mile limit, concluding that this was solely a matter between the state and one of its own citizens: "The arrests to which appellant alleges he was subjected were an integral part of the efforts of the State of Florida to regulate the conduct of one of its own citizens in a manner in which the State clearly had a legitimate interest." The fact that some arrests may have occurred just beyond the three-mile limit did not transmute these enforcement efforts into constitutional violations.

In *People v. Foretich*,[85] the court dealt with a charge of taking fish with illegal gear. Defendants, who were California citizens, claimed to be outside the territorial waters; the State of California said they were within state waters. The court made a ruling on the boundary dispute such that defendants were within the line, but also noted that the statute clearly intended the law to operate in the area of dispute, and held that by *Skiriotes* it was fully capable of prosecuting its own citizens beyond the territorial limits. There was held to be no conflict with 16 U.S.C. § 1094, because that section was part of the 12-mile Contiguous Fisheries Zone Act, 16 U.S.C. §§ 1091–94, which was not itself a regulation of the fisheries in that zone.

Another case discussing this issue is *Gherra v. California Fish and Game Dep't*.[86] Certain shrimp fishermen, citizens of California, fished in California shrimp beds until the regular yearly closure, then fished in a shrimp bed beyond the three-mile limit, partly beyond the 12-mile contiguous fisheries zone. During this latter period they operated with Oregon fishing permits, and without reenter-

ing California waters. California's closing laws specifically apply to this bed beyond the three-mile limit, and some fishermen were prosecuted for violating the closure (it was enforced only against California citizens). The three-judge federal court upheld the statute under *Skiriotes*. It stated:

California does have a legitimate interest in regulating the taking of shrimp from the ocean off its coast. The shrimp bed in question was discovered and developed by California officials. It is adjacent to California territorial waters and, shrimp being migrating fish, some of them undoubtedly enter California during their migration. The ability of California to control the shrimp within its territorial waters is dependent, to some extent, upon its ability to limit the extraction of shrimp from the bed beyond.

The court also found no federal preemption, since no federal law actually conflicted with the state regulations. The law applies only to Californians, the court noted, and this was the basis of the state's jurisdiction, not the situs of the regulated activities.

We must confess at this point that the various interpretations of the case law in this area as urged by able counsel are clearly within the language of the opinions, and we would have an extremely difficult time favoring one approach over the other were it not for a recent decision of the Supreme Court of the United States which appears generally to tip the balance in favor of the appellants herein.

In *United States v. Alaska*,[87] the United States Supreme Court noted a distinction between regulation for the purpose of fish and wildlife and the exercise of historic dominion for the purpose of establishing

---

84. *Id.* at 339.

85. 92 Cal.Rptr. 481, 14 Cal.App.3d Supp. 6 (Cal.App.1970).

86. No. 47823 SAW (N.D.Cal.1973) [unpublished opinion reprinted in Appendix to appellant's brief in No. 2435].

87. 422 U.S. 184, 95 S.Ct. 2240, 45 L.Ed. 2d 109 (1975).

sovereignty by the United States or a state:

> Our conclusion that the fact of enforcement of game and fish regulations in Cook Inlet is inadequate, as a matter of law, to establish historic title to the inlet as inland waters is not based on mere technicality. *The assertion of national jurisdiction over coastal waters for purposes of fisheries management frequently differs in geographic extent from the boundaries claimed as inland or even territorial waters.* See, e. g., Presidential Proclamation No. 2668, 59 Stat. 885 (1945). *This limited circumscription or the traditional freedom of fishing on the high seas is based, in part, on a recognition of the special interest that a coastal state has in the preservation of the living resources in the high seas adjacent to its territorial sea.* Convention on Fishing and Conservation of the Living Resources of the High Seas, Art. 6, ¶ 1, 17 U.S.T. 138, 141, TIAS 5969 (1966). [Emphasis added]

This distinction constitutes a basic premise in this opinion and is important herein because it recognizes the simple but inescapable argument of appellant that in the absence of some effective regulatory power, the coastal state is totally unable to protect and preserve what are functionally its fisheries resources. In the instant case, the migratory habit of crab are demonstrated in the record. Most of the developmental stages in a crab's life occurs in territorial waters of the state and little fishing for crab is done in such waters because of the condition of the crab during this period. However, the crab then move into deeper waters for feeding, etc. and the fishing begins. In the absence of any control over these areas, the entire stock of the fishery can be depleted to the point where no crab fishery exists. The detriment to all persons is obvious.

We will now turn to analysis of the particular aspects of the problem of extending the state's police power jurisdiction extraterritorially.

The state has bolstered its argument by reference to cases from other states in which a "landing law" [88] has been upheld as being within the constitutional power of a state to regulate activity outside the area of its sovereignty. It cites a number of cases which will be discussed in turn.

In *Silz v. Hesterberg,*[89] the Supreme Court upheld New York laws prohibiting the possession of game in New York during a closed season, including game brought in from outside the state. The Court stated that the laws were aimed not at affecting the legality of taking game outside the state, but rather at protecting game located in the state. It concluded on this basis that the laws did not violate the due process clause of the Fourteenth Amendment. The Court also concluded that the laws did not unlawfully regulate interstate commerce because the effect on commerce was only incidental and remote.[90]

In *Bayside Fish Co. v. Gentry,*[91] the Court upheld certain California fish and game laws that regulated the processing of sardines in California, whether the sardines were taken within the waters of the state or outside them. The purpose of the regulation, the Court found, was to conserve for food the fish found in state waters. The provisions regulated only manufacture within the state, and their direct operation, intended and actual, was wholly local. The Court found any effect on in-

---

88. As mentioned earlier in this opinion, "landing laws" are laws which prohibit the possession, sales or transportation of fish or game in a state which are taken in violation of state laws or regulations.

89. 211 U.S. 31, 29 S.Ct. 10, 53 L.Ed. 75 (1908).

90. *Id.* at 40–41, 29 S.Ct. at 12, 53 L.Ed. at 79–80.

91. 297 U.S. 422, 56 S.Ct. 513, 80 L.Ed. 772 (1936).

terstate and foreign commerce to be "purely incidental, indirect, and beyond the purposes of legislation." [92] To the extent the laws dealt with the use or treatment of fish brought into the state from outside, the Court stated, their legal justification rested on the ground that they operated "as a shield against the covert depletion of the local supply, and thus tend[ed] to effectuate the policy of the law by rendering evasion of it less easy." [93]

Other courts have upheld similar laws on similar bases.[94] In each, the courts found that it was a valid exercise of police power for states to attempt to conserve fish located in state waters. The courts found further that this power includes the right to prohibit possession of fish taken outside the state or, in the case of *Santa Cruz Oil, supra,* to require a permit for any fishing boat operating in state waters, even if the boat caught all of its fish outside the state. Courts have found the effects of these laws on interstate commerce to be incidental and necessary to prevent possible deception by the fishermen: fishermen might otherwise subvert the conservation efforts of the states by fishing in state waters but claiming that they took their catch beyond those waters. The inability to distinguish fish taken within the state from those taken outside would render enforcement of the state laws difficult at best.

Appellees counter by asserting, as was posited in *Hjelle v. Brooks,*[95] that a state may regulate extra-territorial conduct only if the regulations facilitate conservation of a resource clearly within the state. They then take the position that since the majority of all fishing for king crab occurs outside the three-mile limit, and that crab only come inside the limit to mate or molt, there is simply no state fishery to be protected by the regulations.

However, the key question is whether Alaska's interest qualifies as one recognized for a legitimate exercise of police power. The answer is clearly yes— there is an established fishery with clear economic impact in the Bering Sea fishery area. The migratory habits of the crab are predictable and fishing outside the three-mile limit depends on growth and development within the limit. If the fishery outside the three-mile limit destroys the resource outside, it will similarly destroy the resource inside the three-mile limit. If the State of Alaska cannot protect this resource under its police power, then such power is far more limited than any recorded case reveals.

We do not find that the state's interest in regulation is as limited as the position asserted by appellees and adopted by the three-judge federal court in *Hjelle.* The *Hjelle* court based its decision on the conclusion that the purpose of the landing laws was to regulate the crabs beyond the limit, not within it. The court said:

> This line of cases leads us to conclude that Alaska's proffered nexus between its legitimate state interests and its regulation of certain extraterritorial conduct would pass constitutional muster if its regulations were directed at conserving the crab fishery *within* Alaska's waters by regulating crabbing in that area, and, *in order to facilitate enforcement,* by prohibiting the possession of crab in the state during the closed season, even if that crab were caught outside the state. Despite the state's claim that the regulations are on "all fours" with these "landing law" cases, we find, after considering the language of the regulations and the affidavits presented . . . "reasonably certain" to establish that the

---

92. *Id.* at 426, 56 S.Ct. at 515, 80 L.Ed. at 775.

93. *Id.* at 426, 56 S.Ct. at 515, 80 L.Ed. at 775.

94. See *Frach v. Schoetler,* 46 Wash.2d 281, 280 P.2d 1038 (1955); *Johnson v. Gentry,*

220 Cal. 231, 30 P.2d 400 (1934); *Santa Cruz Oil Corp. v. Milnor,* 55 Cal.App.2d 56, 130 P.2d 256 (1942).

95. *Hjelle v. Brooks,* 377 F.Supp. 430 (D.C. Alaska 1974).

regulations do not fall within the purview of these cases.[96]

We conclude that an analysis of those cases cited demonstrates that in fact these decisions were justified primarily on conservation of the resource. The *Silz* decision, for example, may well have relied solely on the difficulty of enforcement, but that case is distinguishable on its facts, involving game which clearly did not migrate in and out of the state but with respect to which a difficulty of enforcement did exist due to the identity of the species.

In all of the "landing law" cases cited by the *Hjelle* decision and this court, not one required that an enforcement problem be necessary. While in most of the cases an enforcement problem did exist, it is unquestionable that those courts were apprised of the simple conservation principle which exists in the case at bar. Like the fish in all of the cases in question, crab exist both within and without the territorial waters of the State. It is impossible to quantify the amount of crab within Alaska waters in the BSSA (due in part to the lack of precise boundaries in the Bering Sea),[97] but it is clear from the facts that it is not "very small" as the *Hjelle* court preliminarily concluded; in fact it is rather significant at some times of the year, and fishable quantities exist during all times of the year.

Of those cases cited in *Hjelle*, the *Frach* case, *supra*, is perhaps the most directly analogous. There, a Washington statute requiring a permit for bringing certain fish taken on the high seas into the state was upheld as constitutional. The court found no conflict with the interstate commerce clause, since any burden on interstate commerce was the indirect result of a measure needed to facilitate regulation of instate fishing, because of the impossibility of distinguishing among fish caught different places. That case involved salmon which, like crab, spend the substantial portion of their lives on the high seas and return to state waters for only short periods of time to spawn. In several respects, however, salmon as a migratory resource present a more extreme case than crab in that they spend the majority of their lives in high seas areas far beyond territorial waters, while Alaskan crab do not. Also, there are periods when salmon are totally absent from state waters, whereas crab exist year round in fishable quantities in the territorial waters of the Bering Sea.

Since the regulation in question was enacted pursuant to the State's "police power," we also note an Alaska decision on this subject. In *Kingery v. Chapple*[98] we noted that when a regulation is challenged as a violation of the police power of the state, the issue is whether the regulations bear a reasonable relationship to the purpose sought to be achieved. While this Court in *Kingery* held that under these circumstances the state is required to come forward with at least prima facie evidence that a reasonable relationship exists, the *Hjelle* court seemed to be requiring that the state prove conclusively that its system provide the most effective system with the least possible infringement on "extra-terrtiorial conduct."[99]

Nor did the *Hjelle* court give the state the benefit of all doubts in deciding the nature of the purpose behind the state's regulations.[100] Rather, the court in *Hjelle* assumed that the state sought to directly regulate extra-territorial conduct because the quota was based on fishing in the entire area, because one regulation prohibits the possession in Alaska only of that crab and sea life "taken seaward" of Alaska territorial waters, and because the percentage of king crab taken commercially within Alaska waters is very small. These conclusions run contrary to all authority on

96. 377 F.Supp. at 441.

97. *Id.*, at 445.

98. 504 P.2d 831, 835–36 (Alaska 1972).

99. *Hjelle v. Brooks*, 377 F.Supp. 430, 441 (D.C.Alaska 1974).

100. *Id.* at 431.

the subject regarding the intent to be given state laws.

▇ The intent of the state's laws and regulations is clearly not to effect extra-territorial activity to any greater extent than is necessary to preserve the king crab fishery within state waters. If it is not clear from the legislative findings in AS 16.10.180, it is certainly clear from the facts developed in this case—crab are migratory creatures which move offshore, beyond the state's territorial boundary at various times during a given year. If the state is to conserve the crab existing within the state, it must regulate the taking of crab outside the state. If fishermen were allowed to fish the crab beyond the state's border unregulated, the maximum sustained yield of crab both inside and outside the state would decrease.

Unlike the situation in *Silz*, where the extra-territorial taking would not in the least affect the in-state resources stocks, the interdependency of the in-state and extra-territorial resources is determinative. AS 16.10.180(4)(5) makes it clear that the purpose of the application of fisheries laws to the high seas is to conserve shellfish found "inside the waters of the state." The method of accomplishing this purpose is reasonably related to the purpose; it is, therefore, permissible. *Kingery v. Chapple, supra.*

Nor can defendant argue that the effect on extra-territorial conduct somehow requires a higher standard of review. Such a requirement is nowhere to be found in any of the extra-territorial conduct cases. *Hjelle,* while seemingly applying a higher standard, failed to consider either *Skiriotes* or *Toomer v. Witsell, supra.* Those cases clearly found sufficient nexus on only minimal proof of "nexus" while extra-territorial regulation was clearly necessary to preserve a migratory resource.

Finally, the *Hjelle* court in fact specifically recognized that other "nexus" might well sustain the regulations in question if developed by competent evidence. In the case in question, such competent evidence exists before this court in the stipulations of the parties, and we conclude that on balance a sufficiently close connection to legitimate state interests has been established to validate the state's limited efforts to regulate this resource.

We are cognizant of the unfortunate situation created by a restrictive reading of the "landing law" cases. The state which is the fishery breeding ground has no ability to regulate unless it can demonstrate a local fishery resource. Consequently, in undeveloped areas of Alaska such as the northern portions of the Bering Sea and the Arctic Ocean there could simply be no regulation. The subsistence nature of the fishery and the lack of economic development by the aboriginal inhabitants prior to the Alaska Native Settlement Act of 1972 would be the fortuitous circumstance which prevented regulation. We find such a view to be, in short, unrealistic and unacceptable. We therefore conclude that a state may reasonably extend its jurisdiction to control fish and game resources outside the limited area of its territorial sovereignity, if such an exercise is based on the conservation principles inherent in their migratory characteristics and not based on artificial boundaries or political circumstances.

B. People to be Controlled.

Almost indistinguishable from the question of the area of control is the extent of control over fishermen, both local and foreign; this is so mainly because the reasoning applied to one area is equally applicable to the other.

Appellees urge a restrictive reading of *Skiriotes* [101] to limit the extra-territorial control over fisheries solely to residents of the State of Alaska. The effect of such a result is obvious from both a conservation and a practical standpoint.

If the state has no authority to regulate non-resident fishermen of a migratory

101. *Skiriotes v. Florida,* 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1942).

fishery species it has no effective authority to regulate the fishery. As noted in the dissenting opinion in *Hjelle v. Brooks:* [102]

The Bering Sea king crab population data obtained by the National Marine Fisheries Service establishes that the present capacity of commercial fishermen to take king crab far exceeds the estimated maximum sustained yield of the Bering Sea Shellfish Area. Biologists generally agree that productivity of this fishery cannot be sustained absent a regulatory scheme such as that which plaintiffs presently attack. . . .

Further, if a state is forced to distinguish between its own citizens and citizens of other states in giving extra-territorial effect to its laws, the state's own citizens can easily frustrate the legitimate objectives of these laws by simply tranferring their citizenship to another state. An Alaskan citizen, for example, could easily avoid the effect of Alaska's laws by transferring his citizenship to Washington. This reality is hardly the same as that apparent in international issues since it is considerably more difficult, and less advantageous, for a citizen of one nation to change his citizenship to another nation in order to avoid the effect of his nation's extra-territorial fishing laws. Hence, a narrow reading of the citizenship limitation suggested in *Skiriotes* could lead to the deliberate frustration of a state's extra-territorial fishing laws. The state suggests, instead, an important and acceptable widening of the usefulness of *Skiriotes* by its reading of the concept "citizen." If only Alaskan citizens may be restricted in their Bering Sea crabbing, the regulation will not be very efficacious in managing the stock.[103] But the state's theory would broaden the *Skiriotes* concept of "citizen" to encompass all American nationals, and hence most if not all of the Bering Sea crabbers, because of their numerous nexi with Alaska.

The state's theory is based mainly on one case, but it draws on certain general principles of domestic and international law as well. The one case is *Jacobson v. Maryland Racing Commission.*[104] Jacobson, an owner and trainer of race horses, was licensed as such by the Maryland Racing Commission. A rule of the Commission prohibited resale of a horse claimed in a claiming race for 60 days after that race. Jacobson claimed three horses in a Maryland race and within 60 days sold them in New York. The Commission thereupon suspended his licenses, and Jacobson filed a petition asserting, among other things, that the Maryland rules could not be applied against his out-of-state activities. The court, after pointing out that only by means of a license from the Commission could one engage in racing in Maryland, held Jacobson bound by the Commission's rules. It invoked the very general proposition that acts done outside a jurisdiction which produce detrimental effects inside it justify a state in punishing he who caused the harm as if he had been present at the place of its effect.[105] It also cited *Skiriotes* and declared:

We think that Jacobson had become a racing citizen of Maryland as far as the purposes and effects of the Rules are concerned and that this State acquired sufficient personal jurisdiction over him in matters of licensed racing to permit it to enjoin him by Rule 80 . . . and to punish him if he disobeyed that rule.

---

102. 377 F.Supp. 430, 444 (D.C.Alaska 1974) (dissenting opinion).

103. The record does not show a firm breakdown of Alaskan v. non-Alaskan crab taken in the Bering Sea. We are simply assuming that out-of-staters account for at least a substantial amount of the take.

104. 261 Md. 180, 274 A.2d 102 (1971).

105. *See Strassheim v. Daily,* 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735 (1911); *United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir. 1945); *United States v. Pizzarusso,* 388 F.2d 8 (2d Cir. 1968); Restatement (Second) of Conflict of Laws § 65 (1971); Restatement of Foreign Relations § 18 (1965).

**556**

As applied to the crab cases, the state points to the Alaska licenses and numerous nexi of the defendants with Alaska,[106] and posits that the defendants have thereby become "crab fishing citizens" of Alaska.

Although we are not persuaded that the state's creation of the concept of a "crab fishing citizen" is particularly helpful—or even appropriate—we do find *Jacobson* to afford sufficient rational precedent to conclude that Alaska's regulations in this case do not amount to more than a proper and logical extention of the state's police power.[107] Therefore, we find that all of the persons herein were properly charged.

■ In order that there is no confusion with regard to our holding, we reiterate that the difference in status between each offender does not affect Alaska's jurisdiction over him. Whether the appellee was an Alaska resident (as is Vinberg), was arrested within the three-mile limit (as was Bundrant), or was arrested on the high seas in the Bering Sea crab area (as was Uri), the State may proceed to enforce its crab regulations herein against said appellee.

These cases are reversed and remanded for further consideration in confomity with this opinion.[108]

BOOCHEVER and BURKE, JJ., not participating.

106. The stipulation in *Bundrant*, No. 2295, and similar facts which the state offers to prove in the other cases, effectively establish that Bering Sea crabbers daily make use of Alaskan territorial waters and facilities, and probably could not continue to crab in the area without using Alaskan shore-based facilities.

107. We consequently find ourselves in complete agreement with analysis suggested in *United States v. Thompson*, an unreported decision by the United States District Court for the District of Alaska (No. A–87–72 Cr., Dec. 15, 1972) [see appendix, Ant Br, 2295], where the court concluded that the constitutional propriety of an effort by the State of Alaska to regulate the polar bear hunting "activities of American citizens [who were non-residents of Alaska] on the high seas adjacent to Alaska is not subject to censure in light of *Johnson v. Gentry*, 220 Cal. 231,

RABINOWITZ, Chief Justice (concurring).

I concur in that portion of Justice Erwin's opinion which deals with the issues of federal exclusivity and federal pre-emption. Justice Erwin persuasively demonstrates that Alaska's regulation of crabbing both within and beyond its territorial seas is entirely compatible with the federal constitution and existing federal legislation. However, I deem it appropriate to express my views regarding the permissible reach of state police powers in the absence of paramount federal authority.

■ I think it significant that the appellees in this matter were prosecuted under different statutes and regulations which are deserving of individual analysis. Appellee Bundrant was prosecuted for possessing, within Alaska's waters, crab taken in a high seas area that had been closed to fishing.[1] Such conduct has been criminalized by AS 16.10.200, which provides:

> It is unlawful for a person taking migratory fish and migratory shellfish in high sea areas designated by the Board of Fisheries or in violation of the regulations promulgated by the Board of Fisheries governing the taking of migratory fish and migratory shellfish in the designated areas to possess, sell, offer to sell, barter, offer to barter, give or transport

30 P.2d 400 (1934), and *Skiriotes v. Florida*, 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1940)."

108. By virtue of our decision herein, we did not pass on other legal arguments advanced by appellees. The decision of the trial court was based on the doctrine of federal pre-emption, and he did not consider other grounds for dismissal. Clearly these arguments may be renewed in the trial court.

1. The relevant regulations applicable at the time of Bundrant's alleged criminal conduct were 5 AAC 07.100, which defined the regulatory area in question, and 5 AAC 07.760, which authorized closure of the area when a quota of 23 million pounds of king crab was met. The quota was reached and the area closed effective September 9, 1973, and Bundrant's actions occurred shortly thereafter.

in the state, including the waters of the state, migratory fish or migratory shellfish.

Functionally this legislation is indistinguishable from the so-called "landing laws" which numerous courts have sustained as a valid exercise of state police powers.[2] Although these laws unquestionably have an effect on conduct beyond the territorial confines of a state, their legitimacy derives from the fact that their objective is the preservation of an important state natural resource, the loss of which would impair the health, safety, and welfare of the particular state. Thus, AS 16.10.200 is equally legitimate as an exercise of police powers if it can be said that the State of Alaska has a valid interest in the migratory crab resources within its territorial waters. I think the record in the case at bar demonstrates that Alaska has such an interest. Here we have evidence that crab exists within Alaska's waters throughout the year,[3] and according to the evidence, this resource is subject to constant fishery harvest.[4] Even when in the stages of molting and mating these crabs remain of value both to man and to the larger marine ecosystem. Walrus, sea otters, fur seals and a variety of other marine mammals which inhabit our territorial waters depend on king crab as a major source of food.[5] Thus, the crab population in Alaskan waters is of inestimable importance to those whose lives and livelihood depend on our marine resources.

■ Although the regulations promulgated in fulfillment of this legislation may not have been drafted as artfully as some would wish, I find no reason to doubt that the legislature's objective in enacting AS 16.10.200 was the protection of marine resources within the state. Indeed, in AS 16.10.180 the legislature stated as much rather explicitly:

The legislature finds and recognizes these facts:

(1) Migratory fish and migratory shellfish are present in commercial quantities inside and outside the territorial waters of the state.

(2) Migratory fish and migratory shellfish taken from the waters of the state are indistinguishable, in most cases, from those taken from the adjacent high seas.

(3) Substantial quantities of migratory fish and migratory shellfish move inshore and offshore intermittently and at various times during a given year and in so doing often enter and leave territorial waters of the state.

(4) To conserve the migratory fish and migratory shellfish found inside the waters of the state it is necessary to strictly enforce local laws and regulations.

(5) By making certain laws and regulations passed or promulgated for the regulation of the coastal fishery applicable to the adjacent high sea areas, enforcement of these laws and regulations is facilitated.

(6) Conservation regulations should not be promulgated to impose economic sanctions.

■ It follows that AS 16.10.200 is fully sustainable as a conventional landing law and under the authority of the landing law cases,[6] appellee Bundrant may be validly prosecuted for possession of king crab within the state in violation of that provision.

2. *Compare*, for example, the challenged statutes in *Frach v. Schoettler*, 46 Wash.2d 281, 280 P.2d 1038 (1955), and *Johnson v. Gentry*, 220 Cal. 231, 30 P.2d 400 (1934).

3. Stipulation 28 in no. 2295.

4. Statements of Emergency by the Fish and Game Board, May 9, 1974, and June 25, 1974.

5. Stipulation 20 in no. 2295.

6. *E. g., Bayside Fish Co. v. Gentry*, 297 U.S. 422, 56 S.Ct. 513, 80 L.Ed. 772 (1936); *Silz v. Hesterberg*, 211 U.S. 31, 29 S.Ct. 10, 53 L.Ed. 75 (1908); *Frach v. Schoettler*, 46 Wash.2d 281, 280 P.2d 1038 (1955); *Johnson v. Gentry*, 220 Cal. 231, 30 P.2d 400 (1936); *Santa Cruz Oil Corp. v. Milnor*, 55 Cal.App.2d 56, 130 P.2d 256 (1942).

Appellee Kaldestad was also charged in count IV with possession of crab within state waters in violation of AS 16.10.200 and AS 16.05.920.[7] Prosecution of this count also represents the legitimate enforcement of a valid landing law.[8]

The 14 appellees in *Uri et al.* (no. 2435) and appellee Kaldestad in the first three counts (no. 2444) were charged with violating various provisions of the emergency regulations promulgated June 15, 1974. These measures prohibited the taking[9] and possession[10] of king crab and the possession of crabbing equipment[11] during a closed season in a registration area subject to state regulation. The criminal acts which form the basis of these charges allegedly occurred in the Bering Sea from 16 to 60 miles off the coast, in an area designated as registration area Q.

The legislature has attached criminal sanctions to the violation of such regulations by the terms of AS 16.05.920 and AS 16.10.200. Thus, the legality of these prosecutions depends upon whether the state may validly apply its crabbing regulations to this conduct occurring beyond territorial waters.

Among these appellees there is one, Emil Vinberg, who is a citizen of the state of Alaska. It is clear since *Skiriotes v. Florida*, 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941), that a state may regulate the extraterritorial fishing activities of one of its citizens where the state has a legitimate interest in the fishery involved. Alaska has such a concern in the Bering Sea crab fishery, and therefore the prosecution of

appellee Vinberg under the emergency regulations is controlled by *Skiriotes* and its progeny.[12] The prosecution of Vinberg is valid.

The other appellees in *Uri et al.* maintain residences outside the state of Alaska, as does appellee Kaldestad. Although their seasonal occupation allows them to maintain a formal citizenship elsewhere, these fishermen participate extensively in the economy of Alaska's seacoast communities. They depend on Alaskan industry and hospitality for a vast range of support services, including shelter, food, fuel, repair services and medical care.[13] I join in Justice Erwin's view that *Skiriotes* provides an adequate foundation for the validity of the action against these appellees. That case is one manifestation of the larger principle that a state may apply sanctions to activity outside its borders which has a substantial, direct and foreseeable deleterious effect within the jurisdiction when it is undertaken by a citizen of a sister state who has significant contacts with the jurisdiction. Thus, in my opinion, the prosecution of the remaining appellees under the emergency regulations is also a valid exercise of the state's police powers.

In summary, therefore, the landing law cases emanating from *Silz v. Hesterberg*, 211 U.S. 31, 29 S.Ct. 10, 53 L.Ed. 75 (1908), authorize the State's prosecution of appellees Bundrant and Kaldestad under count IV. The prosecution of appellee Vinberg is unquestionably authorized by *Skiriotes v. Florida, supra.* Under the broader principle governing the extraterri-

---

7. AS 16.05.920(a) provides:
 Unless permitted by this chapter or by regulation made under this chapter, it is unlawful for a person to take, possess, transport, sell, offer to sell, purchase, or offer to purchase fish, game or marine aquatic plants, or any part of fish, game or aquatic plants, or a nest or egg of fish or game.

8. The validity of the other three counts lodged against appellee Kaldestad are considered in conjunction with the charges filed against appellees *Uri et al., infra.*

9. 5 AAC 34.910.

10. 5 AAC 34.090(c).

11. 5 AAC 34.095.

12. *E. g., Felton v. Hodges*, 374 F.2d 337 (5th Cir. 1967); *People v. Foretich*, 14 Cal. App.3d Supp. 6, 92 Cal.Rptr. 481 (1970); *Gherra v. California Fish and Game Dep't*, No. 47823 SAW (N.D.Cal., 1975).

13. Stipulations 9–19 in no. 2295.

torial application of criminal laws, manifested in part in *Skiriotes,* the remaining appellees in *Uri et al.* and appellee Kaldestad may also be prosecuted for their conduct. Justice Erwin and I break new ground, if at all, only in expressly recognizing that broader principle.

CONNOR, Justice (dissenting).

Like the crabs about whom the dispute exists, many of the questions presented in this appeal can be discerned only by peering through murky waters. The arguments are close. However, my examination of the problems presented leads me respectfully to dissent. It is on the question of federal preemption that I depart from my colleagues.

The majority finds that the regulation of crabbing outside the marginal sea is not preempted by the federal government. I am willing to concede at the outset that *United States v. California (First California),* 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947), does not, alone, establish federal preemption of state regulation. That case only established federal ownership of the land beneath the marginal sea in the sense that the federal government has the "paramount" right and power in the area. 332 U.S. at 33, 39, 40, 67 S.Ct. 1658. While establishing federal *dominium,* a subordinate right of state *imperium* was apparently not precluded.[1] The court in *First California* distinguished one prior case, *The Abby Dodge,* 223 U.S. 166, 32 S.Ct. 310, 56 L.Ed. 390, (1912), on the grounds that *First California* was not prohibiting state regulation. The next year saw the court's decision in *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948), which supports the legitimacy of a state's jurisdiction over its own citizens for regulatory purposes on the high

seas, i. e., *imperium,* rather than *dominium,* over shrimp.

The rationale for the *First California* decision is important. The court reasoned that control of the sea and its resources is so bound up with international affairs and national defense that it "is a question for consideration among nations as such, and not their separate governmental units." 332 U.S. at 35, 67 S.Ct. at 1666, 91 L.Ed. 1889. This rationale, read expansively, might suggest a reason for preemption of all state regulation, at least of citizens other than its own, in the high seas outside its own borders.

Congress, as noted by the majority, reversed the *First California* case with respect to the marginal sea via the *Submerged Lands Act (SLA),* 43 U.S.C. §§ 1301–1315 (1953). Later in the same year, it claimed at least federal ownership of the continental shelf beyond the marginal sea through the *Outer Continental Shelf Lands Act (OCSLA),* 43 U.S.C. §§ 1331–1343 (1953). This second act began life as an amendment to the SLA, but became separated in the course of passage.

The net effect of these two acts was to establish state ownership of the traditional marginal sea, while at the same time asserting ownership of and jurisdiction over the continental shelf as against foreign governments, and vesting that ownership and jurisdiction in the federal government That federal control was to encompass both ownership and regulatory authority was indicated by Senator Cordon (the manager of OCSLA) at 99 Cong.Rec. 6963 (1953), where he appears to show.approval for certain language contained in a Justice Department report:

"On the other hand, as pointed out in the report made by the Department of

---

1. *Dominium,* a concept which derives from Roman law, denotes ownership and property rights, while *imperium* concerns regulatory power or control over a geographical area without reference to ownership. *United States v. California (First Californa),* 332 U.S. 19, 43–44, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947) (Frankfurter, J., dissenting); *see also* P. Jessup, The Law of Territorial Waters and Maritime Jurisdiction 62, 118, 400–407 (1927; Kraus Reprint 1970); Webster's Third New International Dictionary, 1133 (1968).

Justice on S. 1901, the area is one in which national problems intermingle. The outer Continental Shelf is not and never has been within the boundary of any State or Territory, and it is, therefore, uniquely an area of exclusive Federal jurisdiction and control. . . . The report of the Department states in part:

'This—that is, the outer Continental Shelf—is a Federal area, outside State boundaries, and to give the states a sort of extra territorial jurisdiction over it is unnecessary and undesirable. The situation is not comparable to that of federally owned areas within a State, as to which State law has some measure of applicability. Particularly in view of the intermingling of national and international rights in the area, it is important that the Federal Government, which has the responsibility for handling foreign relations, have the exclusive control of lawmaking and law enforcement there.' "

An amendment by certain senators which would have extended state jurisdiction to the Continental Shelf, including the "conservation laws" of the states, was defeated. 99 Cong.Rec. 7228, 7230, 7232 (1953). Most importantly, the language of the statute itself (43 U.S.C. § 1332 (1953)) provides for federal "jurisdiction, control, and power of disposition." This would appear to encompass considerably more than mere "ownership".

Notwithstanding all this, the majority believes that crabs were not intended to be covered by the OCSLA. 43 U.S.C. § 1332(b) (1953) expressly provides that the OCSLA does not affect "the character as high seas of the waters above the outer Continental Shelf and the right to . . . fishing therein . . . ." It is true that the principal concern of Congress was with mineral deposits, not living resources. *See* H.R.Rep. No. 413, 83rd Cong., 1st Sess. (1953). But it should be recognized that the language of the OCSLA was at the same time an attempt to establish the policy of the United States to

appropriate the resources of the continental shelf with respect to foreign governments. Therefore the interpretation of OCSLA in the context of international law is relevant, if not conclusive, as to its meaning. It does not seem likely that the same language, indeed the same sections, could have a different meaning in international law from its meaning for preemption purposes. *Cf. United States v. California (Second California)*, 381 U.S. 139, 165, 85 S.Ct. 1401, 14 L.Ed.2d 296 (1965); *United States v. Ray*, 423 F.2d 16, 21 (5th Cir. 1970).

The rights of nations to the resources of the continental shelf were more clearly defined in international law by the Geneva Convention on the Continental Shelf, 15 U.S.T. 471, T.I.A.S. 5578 (1958). Article 2.4 of that convention provides that the natural resources appertaining to nations shall include,

"living organisms belonging to sedentary species, that is to say, organisms which, at the harvestable stage, either are immobile on or under the seabed or are unable to move except in constant physical contact with the seabed or the subsoil."

That crabs are included in that classification is past dispute in this country. *See* Agreement Between the Government of the United States of America and the Government of the Union of Soviet Socialist Republics Relating to Fishing for King Crab, [1965] 16 U.S.T. 24, T.I.A.S. No. 5752, art. 1; Agreement Between the Government of the United States of America and the Government of the Union of Soviet Socialist Republics Relating to Fishing for King and Tanner Crab, [1973] 24 U. S.T. 603, T.I.A.S. No. 7571, art. 1 (extension: December 31, 1974).

In order to vest the greatest rights in the United States as against foreign governments, the terms of the OCSLA must be interpreted broadly in light of later developments. One court has even held that "[t]o the extent that any of the terms of the [OCSLA] are inconsistent with the later adopted Geneva Convention on the

Continental Shelf, they should be considered superseded." *United States v. Ray,* 423 F.2d 16, 21 (5th Cir.1970).[2] I see nothing in the OCSLA, however, inconsistent with the interpretation that crabs are a resource of the continental shelf, and hence appertain to the United States as against foreign and state governments, rather than of the water column above. *United States v. Ray, supra,* found this to be the case with coral, also a "sedentary species". Of course, *Guess v. Read,* 290 F.2d 622, 625 (5th Cir.1961), *cert. denied,* 368 U.S. 957, 82 S.Ct. 394, 7 L.Ed.2d 388 (1962), cited by the majority, is totally inapplicable here. All would agree that the OCSLA and the treaties pertaining to the continental shelf do not affect rights to the air above the sea, or the water column above the shelf.

Reliance upon various portions of legislative history dealing with the relationship of the OCSLA to "fishing rights" begs the question. Whether crabs are included in fishing rights or are a resource of the ocean floor, for purposes of the act is precisely the question at issue here. Senator Cordon's language indicates only that the Senator believed fishing rights for "all marine life *above the land itself* beneath the seas" (emphasis added) were not included in the OCSLA. *See* Sen.Rep.No. 411, 83rd Cong., 1st Sess. (1953). But crabs, in both international law, as related above, and municipal United States law, Bartlett Act, 16 U.S.C. § 1085 (1964), are creatures of the sea floor, and not fish belonging to the water column "above the land itself."

I conclude that crabs, as a resource of the continental shelf, may be regulated only by the federal government when they are taken outside the three mile marginal sea under the provisions of SLA, 43 U.S.C. § 1301(a) and (b) (1953).

The validity of this conclusion can be tested by an inverse approach. Let us assume, *arguendo,* that OCSLA cannot be construed to include crabs as a resource of the subsoil and seabed of the outer continental shelf. It still does not follow that there is no preemption. The SLA, 43 U. S.C. § 1302 (1953) provides:

"Nothing in this chapter shall be deemed to affect in any wise the rights of the United States to the natural resources of that portion of the subsoil and seabed of the Continental Shelf lying seaward and outside of the area of lands beneath navigable waters, as defined in section 1301 of this title, *all of which natural resources appertain to the United States, and the jurisdiction and control of which by the United States is confirmed.*" (Emphasis added)

I would find that the language above from the SLA preempts state regulation beyond the three-mile marginal sea. The section cannot be read as only limiting the effect of the SLA. While that is the import of the first part of the section, the language emphasized above goes further in specifically "confirming"[3] exclusive federal "jurisdiction and control" as against the states. Under this section, it makes no difference whether crabs are conceived of as creatures of the continental shelf or of the water column above it; the section reserves to the United States jurisdiction and control over "all . . . natural resources" outside the marginal sea, and 43 U.S.C. §

2. The United States Supreme Court used a similar rationale in concluding that the definitions provided in The Convention on the Territorial Sea and the Contiguous Zone of 1958 should be used to define "inland waters" under the Submerged Lands Act. *United States v. California (Second California),* 381 U.S. 139, 165, 85 S.Ct. 1401, 14 L.Ed. 2d 296 (1965). In that case, State Department letters from the era of the SLA passage actually contradict the definition later adopted in the 1958 Territorial Sea Convention, and yet the Supreme Court chose the more modern international usage. I know of no reason why this method of interpretation should not also be applied to OCSLA.

3. By using the word "confirm", it would appear that Congress thought control over resources outside the marginal sea was already vested in the federal government by the *First California* case. In my opinion that belief was erroneous (see above).

1301(e) (1953) specifically includes "fish, shrimp, oysters, clams, *crabs*, lobsters, sponges, kelp, and other marine animal and plant life" (emphasis added) within the definition of "natural resources".

The reason for federal preemption must be drawn from the rationale of the *First California* case, *supra*. The whole area of regulation of ocean-floor resources is inextricably entwined with international law and affairs. As we have seen, any rights to regulate at all in the area of the continental shelf derive from recent developments in the unsettled field of the international law of the sea. Congressional proposals to establish a 200-mile federal fishing zone [4] have generated much publicity and dissension; it would appear that Alaska's own federal Senators hold widely divergent views on the propriety of such legislation at this time. The whole topical area, with special reference to ownership and regulatory authority over resources of the continental shelf and deep-sea bed, is currently being negotiated in the International Conference on the Law of the Sea. One of the principal concerns of the United States is attempts by possibly a majority of the world's nations to extend national control farther and farther into the sea.

One reason for this concern is the thrust by other nations, as evidenced both at the Conference and by individual action, to extend unilaterally their territorial seas to 200 miles. The right asserted is the "special interest of coastal States in maintaining the productivity of the living resources of the sea areas adjacent to their coasts . . . ." [5] This is essentially the same basis used by the majority to justify the extension of Alaskan jurisdiction into the Bering Sea. As such, it could cause definite embarrassment to our international negotiators. It is merely one more example —a very current and real example, and not in the slightest "speculative" and "indirect" —of the pervasive involvement of foreign affairs in this area.

In terms of international complications, Alaska's assertion of *imperium* cannot be distinguished from the assertion of *dominium* by certain Latin American states. It is not clear that all Latin American nations recognize a functionally practical distinction between the two; [6] it is even more unclear that those of the world's nations whose legal consciousness is less firmly rooted in Roman Law than is Latin America's, will necessarily and clearly understand the difference intended by Western-

4. "[B]ills that would declare a 200-mile fishing zone have been introduced in both Houses of Congress but the administration is firmly opposed to giving U.S. fishermen exclusive rights out to 200 miles fearing that such action would disrupt the 1974 Law of the Sea Conference where global arrangements on fishing will hopefully be reached." North Carolina University (prepared for National Oceanic and Atmospheric Administration), State and Federal Jurisdiction Conflicts in the Regulation of United States Coastal Waters 8 (1974). It is important to note that this study cannot fairly be characterized as a "federal document" in the sense that it evinces the official policy of the United States. I believe that the reliance upon the officiality of this report in the majority opinion is misplaced.

5. Decree-Law Extending Territorial Sea to 200 Miles, *Diario Official* (Brazil, 30 March 1970), *reprinted in* I S. Lay, R. Churchill, M. Nordquist, New Directions in the Law of the Sea: Documents 15 (1973) (translation by U.S. State Department). Chile, Ecuador, and Peru have adopted a similar ration-

ale: the right of a state to "ensure the conservation and protection of its natural resources and to regulate the use thereof . . . ." Agreements between Chile, Ecuador and Peru, signed at the First Conference on the Exploitation and Conservation of the Maritime Resources of the South Pacific, Santiago, 18 August 1952, *Revista Peruana de Derecho Internacional*, tomo XIV, No. 45, 1954, at 104 *et seq.*, *reprinted in* Lay, Churchill and Nordquist, *supra* at 231 (translation by the Secretariat of the United Nations). *See generally* M. McDougal and W. Burke, The Public Order of the Oceans 453–54 & n. 18 (1962).

6. The Brazilian Decree-Law, *supra* note 5, states that Brazilian "interest[s] can be effectively protected only by the exercise of the sovereignty inherent in the concept of territorial sea." Thus, it apparently does not recognize the efficacy of such notions as limited *imperium* in the regulation of off-shore resources. The recognition of the right of a state to regulate leads inexorably, in Brazil's view, to the establishment of *dominium* over the area.

ers between the terms *imperium* and *dominium*. But perhaps more importantly, it is not at all clear that the United States State Department itself accepts the distinction in all cases. The United States has certainly opposed Canadian legislation purporting to establish that government's *imperium* to regulate pollution in the Canadian arctic, as it relates to the high seas.[7] The Canadians rely upon similar arguments of necessity as do my colleagues in the case at bar.[8]

Even if one assumes that the taking of crabs is "fishing", and does not under OCSLA fall under federal jurisdiction on the continental shelf, it must be noted that the Geneva Convention on Fishing and Conservation of the Living Resources of the High Seas (20 April 1958)[9] provides that when a state properly[10] adopts for its own nationals,

"measures . . . for the purpose of the conservation of the living resources affected"

by fishing (Article 3), and,

"subsequent to the adoption of the measures referred to in articles 3 and 4, na-

tionals of other States engage in fishing the same stock or stocks of fish or other living marine resources in any area or areas of the high seas, the other States shall apply the measures, which shall not be discriminatory in form or in fact, to their own nationals not later than seven months after the date on which the measures shall have been notified to the Director-General of the Food and Agriculture Organization of the United Nations." (Article 5).

Thus, if states may regulate "fishing" on the high seas generally, their regulations, once notified to the proper authorities, create international obligations. Signatory foreign nations whose nationals subsequently fish the area must pass similar laws for their nationals. While this would not immediately affect Bering Sea crab, in particular,[11] it would be applicable in general were the principle established that states may regulate fishing outside the marginal sea. Thus the rationale of the *First California* case, that regulation on the high seas is inextricably entwined with foreign affairs, leads me to the opinion

7. Department of State Statement on Government of Canada's Bills on Limits of the Territorial Sea, Fisheries and Pollution, U.S. Department of State Press Release No. 121 of 15 April 1970, *reprinted in* I S. Lay, R. Churchill, M. Nordquist, New Directions in the Law of the Sea: Documents 211 (1973).

8. Summary of Canadian Note of April 16 Tabled by the Secretary of State for External Affairs in the House, 17 April 1970 (from text provided by Canadian Embassy at Washington, D.C.), I S. Lay, R. Churchill, M. Nordquist, New Directions in the Law of the Sea: Documents 213, 216–17 (1973).

9. *Reprinted in* I S. Lay, R. Churchill, M. Nordquist, New Directions in the Law of the Sea: Documents 353, 354 (1973).

10. Under Article 3, when nationals of other nations are not engaged in fishing in the area. If foreign nationals are so engaged, Articles 4 and 9 contemplate international negotiations between the concerned nations concerning regulations. Such regulations negotiated also become applicable to later nations by the

mechanism of Article 5, as outlined in the text.

11. Japan and the Soviet Union are the two foreign states most interested in Bering Sea crab, and neither is currently a signatory of the 1958 Convention. The danger posed by the Convention in general, however is real; there are 22 signatories, including Great Britain and the United States. It is not enough to reply that the federal government may refrain from notifying the Director-General of the FAO under Article 5. The fact that it might do so, coupled with the existence of the regulations, can be a constant source of irritation in negotiations, especially with nations not fully conversant with the intergovernmental rivalries inherent in American federalism. Further, it is not clear from the wording of Article 5 that only the United States may notify the Director-General. Hence an assurance by the State Department, even if believed, might carry little weight with foreign powers should any uncertainty exist as to whether a third power might be able to notify and set the Article 5 machinery in motion.

that high seas fisheries regulation is reserved to the federal government.[12]

The majority opinion notes that Alaska regulation in this area was promulgated at the request of a federal agency. I note, however, that the United States has filed an *amicus* brief which supports appellees against the State of Alaska. This brief was prepared by the Department of Justice, "in consultation with other concerned federal agencies," and especially in consultation with the Legal Adviser for the Department of State.[13] Thus I cannot infer, as the majority appears to do, that the Alaska regulations have the implicit approval of the federal government, especially as they affect foreign policy.

In conclusion, I would find that:

(1) State legislation is preempted by OCSLA, 43 U.S.C. § 1332(a), as crabs are legally a resource of the ocean floor rather than of the water column above that floor.

(2) State legislation is preempted by SLA, 43 U.S.C. § 1302, regardless of the characterization of the crab resource.

(3) Notwithstanding any of the above, foreign and military affairs are so inextricably entwined with the regulation of high seas resources that, absent explicit Congressional delegation to the states, the area is excluded from state regulation.

Since I would find federal preemption of the field, the subject of state jurisdiction is, in my opinion, irrelevant. Therefore, I express no opinion on that subject. I would affirm the judgment of the superior court.

---

**12.** The majority relies on *Alaska v. Arctic Maid*, 366 U.S. 199, 81 S.Ct. 929, 6 L.Ed. 2d 227 (1961), to show local importance under the commerce clause, and seems to appeal to this argument under its balancing test when considering foreign affairs. This reliance is misplaced. The United States Supreme Court in that case never upheld any attempt by Alaska to tax activity outside the three-mile limit. In fact, the opinion expressly states that if the fish there in question "were taken or purchased outside Alaska's territorial waters, all of respondents' business in the Bristol Bay area would be beyond Alaska's reach." 366 U.S. at 203, 81 S.Ct. at 931. The court remanded the case for a determination of how many fish were obtained outside of Alaska's territorial waters (366 U.S. at 205, 81 S.Ct. 929), and the case was settled on appeal before the Alaska Supreme Court.

**13.** United States Memorandum in Support of Motion for Leave to File Brief *Amicus Curiae* at 2.